Frank H. COFFMAN, II, Plaintiff,

v.

METROPOLITAN LIFE INSURANCE
CO., et al., Defendants.

No. CIV.A. 2:00–1156.

United States District Court,
S.D. West Virginia,
Charleston Division.

Sept. 3, 2002.

Scott B. Elkind, Elkind & Shea, Silver Spring, MD, for Plaintiff.

Michael D. Foster, Erin Magee Condaras, Jackson & Kelly, Charleston, WV, for Defendants.

## MEMORANDUM OPINION AND ORDER

HADEN, Chief Judge.

Pending are the parties' cross motions for summary judgment, which the Court reinstated for consideration following the Order of July 29, 2002 and the parties' ensuing supplemental briefing. After considering the parties' submissions, supplemental materials, and the administrative record, the Court **GRANTS** Defendants' motion for summary judgment and **DENIES** Plaintiff's cross motion.

## I. DISCUSSION

### A. Factual and Procedural Background

#### 1. The Employment Relationship

Plaintiff Frank H. Coffman, II, is fifty-three years old. He was formerly a valued territory representative for Wyeth–Ayerst Laboratories ("Wyeth–Ayerst"), a division of Defendant American Home Products Corporation ("AHPC"). He received many commendations and awards for his dedicated years of service. As a territory representative, Coffman had a host of duties, including visits to health care professionals, pharmacies, and others in Southern West Virginia. He also distributed samples, sold AHPC pharmaceutical products, and maintained account records.

Coffman earned a bachelor's degree in psychology and a master's degree in rehabilitation counseling from West Virginia University. Prior to serving as a Wyeth–Ayerst territory representative, he worked for two years as a disability claims examiner for the West Virginia Division of Vocational Rehabilitation.

While at Wyeth–Ayerst, Coffman participated in AHPC's Employees Group Insurance Program. The Program provided benefits for weekly sickness and accident ("STD") and long-term disability ("LTD"). Defendant Metropolitan Life Insurance Company ("MetLife") insured and administered claims under the Program, including benefits claims under the LTD Plan. AHPC itself provided Coffman life insurance benefits and comprehensive health coverage.

#### 2. The Medical Record

On November 27, 1996 Coffman ceased work after returning from a cruise with his wife. On December 19, 1996 Coffman executed a Statement of Claim for STD benefits. John P. Richards, D.O., completed the Attending Physician's Statement supporting the claim. Dr. Richards diagnosed Coffman with chronic fatigue syndrome (CFS), hypothyroidism, vertigo and other conditions. Dr. Richards did not determine when Coffman could return to work pending the results of a sleep study.

On February 5, 1997 MetLife contacted Dr. Richards about Coffman's claim. Dr. Richards advised he had not seen Coffman in December, January or February. Believing Coffman was no longer under a physician's care, MetLife discontinued benefits. On March 12, 1997 Coffman re-

sponded and requested further review of his claim. He stated:

> [E]very time I try to increase my activity my fatigue .or dizziness gets worse and I can't in a typical day do more than 1/2 to 1 hr. of physical activity or more than 1–2 hrs. reading or mental work as my attention, concentration and mental energy is limited, much less work 8 hrs a day. Some days I don't even have the energy to do daily activities such as take a shower and shave.

(Admin. Rec. at 204.) The response contains a detailed recitation of Coffman's medical history and notes the letter took him two weeks to draft given the need to gather the necessary medical records. The response continues:

> In 10/94 I saw Dr. Richards for increasing fatigue and tested positive for early chronic Epstein–Barr virus which is often seen with Chronic Fatigue Syndrome. I had some initial improvement with antiviral therapy and only missed 5 days of work off sick total although I had to pace myself and work less hours. The CFS symptoms seemed to go into remission by 3/95 when the pharmaceutical company I worked for went through a merger and downsizing. My workload and territory of the state I covered were increased and I went back to working 50–60 hours per week including more paper work in the evening. By 6/95 the fatigue came back and I was seen by my Dr. I started taking more sick and vacation days to rest but by 10/95 the fatigue was even more severe and I again saw my Dr. and had blood work. At that time he explained that increasing fatigue 1–2 days after exertion was typical of CFS. Up until that time I regularly exercised including 20–30 minutes on a Nordic Track ski machine 3–4 times a week for 2 and 1/2 years. I had been physically fit and lost

down to the weight I was 25 years ago. Due to increasing fatigue I had to decrease the exercises and finally quit by the time I saw Dr. Richards in 10/95. Since I also had seasonal allergy he explained that it would put a further burden on my immune system and could contribute to increasing my CFS symptoms, so he put me on a nonsedating antihistamine. From 6/95 through 12/95 I had to take 10 sick days and 13 vacation and personal days off work to stay home.

> From 1/96 through 7/96 I tried to continue working as near a normal schedule as I could by taking off 10 sick days and 6.5 vacation and personal days at home plus sleeping in late on the weekends and staying home resting. But my fatigue still got worse from 8/96 to 9/96 so I took another 7 sick days and only worked 4 days a week. In 10/96 I had to take 8 sick days and made an appointment to see Dr. Richards on 10/22/96. My wife told him that during sleep my snoring had gradually gotten louder and I had brief pauses in my breathing, so he referred me to the Sleep Clinic to test me for sleep apnea to see if it could be contributing to my chronic fatigue.

(*Id.* at 202–03.)

Dr. Zaldivar saw Coffman at the Sleep Clinic in October 1996. Coffman relayed his poor sleep habits to Dr. Zaldivar, noting he had similar habits for 15 years without incident. A sleep study revealed no sleep apnea. Dr. Zaldivar recommended phototherapy and additional sleep. Coffman appears to have disagreed with and dismissed the diagnosis and recommended course of treatment:

> Although Dr. Zaldivar is not very familiar with CFS research or experienced in treating CFS, my results are consistent with its pattern of more light and less deep stage and REM sleep which tends

to be nonrestorative.... I followed this routine for 2 mos. but there was little improvement in my CFS symptoms so insufficient sleep was not the main cause for my problem. This is consistent with my CFS symptoms made worse with physical or mental exertion by not significantly relieved by rest.

(*Id.* at 203.) Dr. Zaldivar ultimately ceased treating Coffman.

Coffman also describes a second disabling condition of chronic vertigo. Dr. Richards referred Coffman to an ENT specialist on January 9, 1997. Testing produced a normal audiogram and electronystagmography (ENG) study. Coffman was then referred to Dr. Wetmore at the WVU School of Medicine on February 17, 1997 after his symptoms worsened. Dr. Wetmore and Dr. Touma evaluated him at that time with an extensive examination of the head, eyes, ears, nose, and throat ("HEENT exam"). The examining physicians simply noted Coffman was a "[p]atient with dizziness, most likely vertigo with unknown etiology, most likely inner ear but no objective testing to support that." (*Id.* at 216.)

On April 24, 1997 Coffman sought LTD benefits while review of his STD benefits claim was in progress at MetLife. On his Statement of Claim, Coffman asserted he was unable to engage in any gainful employment and could not return to work "until an effective treatment for my condition is found." (*Id.* at 422.) Dr. Richards' attending physician's Statement of Functional Capacity of May 2, 1997 listed Coffman's primary disabling condition as CFS and a secondary diagnosis of vertigo. That Statement further noted:

1. Subjective symptoms of "severe physical and mental fatigue not due to exertion not relieved by rest resulting in reduction of activity level to 20–30% normal. Impaired attn., concentration ... muscle and joint pain ... dizziness and nausea." (*Id.* at 424);

2. "Pts. condition limits him from sustaining any physical or mental work for more than st. periods and requires frequent long rest periods." (*Id.*);

3. Coffman should "avoid completely" "cramped/unusual positions[;]" (*Id.*); and

4. "Pt. can only perform lighter lifting and carrying for short periods, distance, and can't sustain any physical exertion for more than 15–20 minutes at a time or 30–60 minutes ... on an average day. Some days a little more and some even less." (*Id.* at 425.)

On May 14, 1997 an initial review by a MetLife disability nurse specialist ("DNS") resulted in a preliminary finding the "medical documentation submitted does not support the claimant's functional inability to adequately perform his job duties as evidenced by" specific references to the medical record. (*Id.* at 239.) Following this initial review, MetLife sent the record to Network Medical Review Company ("NMR") for an independent evaluation.

Dr. Robert L. Bertrand reviewed the record for NMR. Dr. Bertrand is a Board-certified occupational medicine physician, has a masters degree in public health, and serves as an assistant professor at the University of Illinois College of Medicine. His six-page report chronicles Coffman's work history at Wyeth–Ayerst, the medical records he reviewed, Coffman's medical history, functional capacity evaluations, and specifically notes a prior finding his "dizziness and vertigo affect his ability to drive a vehicle safely." (*Id.* at 109.)

Dr. Bertrand's assessment notes "A thorough review of the records provided

supports a mild impairment for Mr. Coffman due to dizziness and fatigue." (*Id.* at 110.) Dr. Bertrand also noted Coffman's retained functional capacities based on the information reviewed. In Dr. Bertrand's opinion, those capacities "are compatible with the Department of Labor Work Category definition of light to medium work." (*Id.* at 111) The *Dictionary of Occupational Titles* listed Coffman's prior work with Wyeth–Ayerst as light in nature. On the subject of CFS, Dr. Bertrand stated:

> [M]edical records provided contain insufficient objective medical evidence of symptomology which meets the diagnostic criteria of chronic fatigue syndrome. To diagnose chronic fatigue syndrome, at least four out of eight symptoms including sore throat, muscle and joint pain and impaired memory must be noted. In a May 4, 1997, letter to Social Security, Mr. Coffman mentions a positive Epstein–Barr profile. However, the Epstein–Barr virus test does not confirm the diagnosis of chronic fatigue syndrome. Further, similar results have been found in the general population.

(*Id.*) (endnoted supporting authorities omitted). Dr. Bertrand further opined:

> In summary, Mr. Coffman has a two-year history of fatigue, sleep disturbance and dizziness. The medical records provided contained insufficient objective clinical findings to support his subjective complaints and do not support that Mr. Coffman is unable to perform the duties of his job as a pharmaceutical representative. Mr. Coffman states in his letter to Social Security that he has had increased work demands over the past two years. I would suggest that Mr. Coffman would try to pace his activities during the day, exercise in the morning, and try to improve his sleep habits to help adjust to these demands.
>
> . . . .

According to the AMA *Guides to the Evaluation of Permanent Impairment,* Occupational Physicians have experience and knowledge in determining workers' disability and handicaps. As a Board Certified Specialist in Occupational Medicine, I have knowledge of Mr. Coffman's condition, and have the expertise to assess and formulate his retained functional capacities. A personal examination of Mr. Coffman is not necessary since my assessment is based on the physical findings of the treating and evaluation physicians. An additional examination by myself would be redundant and is not necessary in formulating the above assessment.

(*Id.* at 112.)

Prior to filing his report, Dr. Bertrand was unable to reach Dr. Richards. After later speaking with Dr. Richards, Dr. Bertrand submitted an addendum to his report on June 13, 1997. Dr. Bertrand wrote:

> Dr. Richards stated that he sees the major disabling problem for Mr. Coffman as severe dizziness and fatigue. Dr. Richards admits that these complaints are quite subjective but Mr. Coffman has told him that he is unable to perform activities of daily living due to these complaints.
>
> Dr. Richards mentioned that he has referred Mr. Coffman to a specialist in chronic fatigue syndrome and that he is to see this specialist in the near future.
>
> . . . .
>
> Dr. Richards is quite concerned about his patient and truly feels that Mr. Coffman has significant impairment. My discussion with Dr. Richards suggested that he holds somewhat to the tenets of a field of medicine called clinical ecology. This area of medicine deals with a belief that nonspecific allergic reactions contribute to significant impairments. The

American Medical Association, through it's [sic] counsel on scientific affairs, has stated a position on clinical ecology. Basically, in a report from 1993, the [AMA] takes the position that clinical ecology is not standard acceptable medical care.....

[T]here is a lack of objective medical evidence to support an impairment of the severity to preclude Mr. Coffman from performing the duties of his regular occupation. In November of 1996, he was able to go on a cruise with his wife and there is no support for any medical problem causing dizziness, as is noted in the assessment. Though Mr. Coffman's symptom complex has been shown to fit the case definition of chronic fatigue syndrome, the actual presentation of this case is not typical of chronic fatigue syndrome. The situation is more likely fatigue of a chronic nature due to other conditions. There is indication in his sleep evaluation that a good part of Mr. Coffman's fatigue is related to poor sleep habits.

(*Id.* at 104–05.)

On July 28, 1997 Judy Lohr, the Wyeth–Ayerst Benefits Unit Supervisor, sent Met-Life a copy of a determination of Coffman's Social Security disability income benefit claim. The determination denied Coffman's benefits claim, but surmised he was considered disabled from his former work with Wyeth–Ayerst. Similar to Met-Life's findings, SSA noted:

Your records show that you are being treated for chronic fatigue syndrome. You are having problems with fatigue, vertigo and sleeping. A sleep study shows that you are not getting enough sleep. You are not having any problems with your hearing. You are able to walk normally.

(*Id.* at 116.)

On August 22, 1997 Coffman requested another review from MetLife of his STD benefits claim. Coffman challenged the findings of one of his own specialists, Dr. Zaldivar. He also reiterated "My case is typical of CFS symptoms made worse with physical or mental exertion but not significantly relieved by rest." (*Id.* at 74)(noting also "Surely six months of plenty of sleep and rest while not working would have been more than enough to recuperate if that was all I needed."). Coffman also noted as follows:

1. One of his ENT specialists, Dr. Wilkinson, stated Coffman was "virtually disabled" because of disequilibrium since his cruise and plane trip; (*Id.*)

2. He had an ELISA/ACT blood test performed on April 8, 1997 "which measures lymphocyte response for delayed or hidden hypersensitivity immune reactions which Dr. Richards felt could contribute to my chronic fatigue. I did test positive to 11 food or chemical substances, 6 of which I had regular exposure to. Dr. Russell Jaffe, MD., PhD. interpretation of my results stated that chronic exposure to reactive substances can result in immunologic dysfunction and drained reserves and contribute to many of my current symptoms.... I have [completely avoided the substances] for three months with a small improvement in my chronic fatigue so far." (*Id.* at 75);

3. He saw Dr. Richards on August 19, 1997 who noted that his CFS was unimproved despite resting 11–12 hours a day;

4. He had an appointment upcoming with Dr. Charles Lapp, a Certified American Academy of Disability Evaluating Physician and CFS expert;

5. "Dr. Wilkinson noted a positive Romberg sign on 1/9/97 indicative of disequilibrium." (*Id.*) Dr. Wilkinson saw him also on July 14, 1997 and noted Coffman's difficulty driving, except for short distances. Dr. Wilkinson also referred him to Dr. M.A. Hamid and raised the question of Motion Sickness Syndrome;

6. He was evaluated by Dr. Hamid, whom he claims is one of the Nation's leading experts on vestibular and balance disorders. An ENG was positive for hyperactive visual ocular reflex and mild nonparoxymal positional nystagmus. Dr. Hamid recommended Coffman avoid driving in hilly areas or curvy roads. He diagnosed Coffman with Disembarkment Motion Sickness Syndrome. He was provided exercises to alleviate the symptoms.

The letter closes with the admonition "If you will be reasonable and allow my claim with the additional medical documentation now, it will not be necessary for me to pursue this claim by taking further legal action, which I assure you I am prepared to do." (*Id.* at 76.)

Coffman's reference to Dr. Wilkinson and Dr. Hamid is illuminated somewhat by a letter from the former to the latter. The July 14, 1997 letter from Dr. Wilkinson notes Coffman "has in addition a diagnosis of chronic fatigue syndrome which he has been able to manage without too much problem." (*Id.* at 85.) The letter also notes:

1. "He has difficulty driving particularly with any movement in his peripheral vision. He has also noted a problem with depth perception and has come close to several auto accidents because of inability to perceive the distance between himself and the oncoming automobile[;]" (*Id.*); and

2. "He also [has] the problem of having been terminated by his employer and has lost insurance benefits and is on Cobra. He also has been denied disability benefits because we have been unable to find any clear objective evidence to support his symptoms." (*Id.*)

After receiving Coffman's letter, Met-Life sent the material again for an independent review by Dr. Bertrand. Dr. Bertrand responded on September 17, 1997 and found Dr. Hamid's findings credible:

> Based on that and Dr. Hamid's recommendation that Mr. Coffman ... avoid driving on hilly or winding roads, he was not capable of driving an automobile to perform duties of his occupation from November 27, 1996, onward. This consultation by Dr. Hamid occurred on August 17, 1997, and Dr. Hamid recommended 6–8 weeks of balance training exercises which were expected to improve this situation. This information indicates that by October 1, 1997, Mr. Coffman will be able to resume driving and therefore, resume the duties of his regular occupation.

(*Id.* at 53.) Dr. Bertrand was not as solicitous of the remaining materials:

> In addressing other information that was provided, Mr. Coffman ... underwent an ELISA/ACT test. This is a test that comes under the definition of clinical ecology, and in the addendum to my original report ... I discussed the [AMA's] position on clinical ecology. This position indicates that clinical ecology is not considered part of mainstream medicine, and that some of their tests and results are not accepted as reflecting true disorders. The key part of the [AMA's] position is that it is not the duty of mainline medicine to prove that

these new procedures are false, but is the responsibility of those performing the tests to prove their validity. This validity testing has not been performed on the type of use being made of the ELISA/ACT test in this circumstance, and therefore, those results do not impact the present assessment. (*Id.*) Dr. Bertrand also observed the disequilibrium diagnosis by Dr. Hamid "would have made it very difficult for [Coffman] to drive an automobile" during the time period from November 26, 1996 to October 1, 1997. (*Id.* at 54.)

On September 30, 1997, and in accordance with Dr. Bertrand's independent review, MetLife reversed itself and approved Coffman's claim for STD and LTD benefits up to September 30, 1997. Specifically, the letter stated "The medical we have on file supported your inability to perform your job as a Territory Representative due to your driving limitations. This was based on your dizziness." (*Id.* at 412.) The letter also noted that Dr. Hamid's report indicated the recommended balancing exercises should improve Coffman's vertigo. It also suggested Coffman should be able to resume driving upon the completion of the six to eight weeks of the exercises. Finally, MetLife requested additional medical information to support the continuation of benefits after September 30, 1997. The total amount of benefits received amounted to $7800.00 for STD and $14,678.39 for LTD.

On September 16, 1997 Coffman submitted to MetLife a September 9, 1997 report from Dr. Charles Lapp, M.D. According to Coffman, Dr. Lapp "is one of the pioneering clinicians who first brought CFS to national attention and has treated over 2000 patients with CFS." He noted as well Dr. Lapp is Board Certified in Internal Medicine and Pediatrics as well as being certified with the American Academy of Disability Evaluating Physicians. Dr. Lapp's evaluation contained the following:

1. Coffman's self-reported symptoms of concentration and memory difficulties, expressive difficulties, disorientation and confusion, resulting in difficulty driving such as missing stop signs, going down one-way streets and an inability to follow a plot in a movie or book;

2. "Mr. Coffman is incapable of more than 30–60 minutes activity or 1–2 hours reading or concentration without rest, otherwise he develops a flare of his symptoms or increasing difficulties with concentration, comprehension, and focus. Gets exhausted by showering and shaving. For 2–5 days per week he is essentially bed or couch bound. Since November he has been out to a movie twice. He is unable to cut the grass ('tried once and it almost killed me!') or do the laundry, he can vacuum a small room on occasion. He is unable to wash the car. He can sit for an hour or two without prolonged rest and can ambulate 30–60 minutes at best. Cannot stand in place. He must nap for 1–2 hours once or twice daily despite >8 hours sleep at night. He attempts to walk 10–20 minutes, do push-ups, lift light weights for up to 10 minutes, following which he must return to bed." (*Id.* at 56.)

3. Coffman was assessed as having CFS and vertigo with a "good" prognosis. (*Id.* at 57.)

An October 21, 1997 follow-up from Dr. Lapp further stated Coffman became ill after exercise testing at Lapp's office from his vertigo and had to stop several times on the way home to throw up. The report also notes a relapse of CFS symptoms

after a vacation trip in October to the Smoky Mountains.

On November 4, 1997, a DNS once again reviewed Coffman's medical information. The DNS noted much of the CFS diagnosis was based on subjective self-reporting. The DNS also faulted Dr. Lapp's assessment as being based on a cardiopulmonary stress test during which Coffman never reached his maximal heart rate as expected.

On November 25, 1997 Coffman completed a Personal Profile Evaluation form to which he appended a three-page letter. The letter included the following statement:

> My ongoing treatment has resulted in some modest but not significant improvement in my dizziness and disequilibrium and only a small improvement in my CFS....
>
> However, even with just driving around town, I still continue to have driving problems and have had several close calls to having an accident. In the past two weeks alone I had three near accidents. Once I started to change lanes and didn't notice a car was there until my wife yelled at me just before I would have hit it. Another time I was on a side road getting ready to pull out on a street. I looked left then right and then I started to slowly pull out but because I was so tenuous and unsure of myself, by then a car was coming from the left and I almost hit it before my wife yelled there was a car coming. Another time I was pulling out onto a road just before it split off in two directions. I knew I wanted to take the road to the left but I got so disoriented that I pulled out onto the left lane of that two lane road and didn't realize it until I saw a car coming head on in the same lane....
>
> In addition to the driving problems, I still experience dizziness and disequilibrium from physical exertion or from frequent or rapid position changes which were required in my occupation. *If I do any moderate exertion for 5–15 minutes or light activity for over 30–60 minutes or read or do paper work for more than 1–2 hours a day it still causes a recurrence of dizziness, nausea and disequilibrium which requires extended rest before it subsides.* This is in addition to the fatigue it causes. Dr. Lapp gave me an exercise test ... for 7.7 minutes which made me very dizzy and nauseated. I laid down for an hour while the rest of the family had lunch. Then they tried to drive me home but just riding in the car made my motion sickness worse until I had to stop and vomit several times so we had to find a motel close by and had to spend an extra night before I could tolerate riding the rest of the way home.

(*Id.* at 394 (emphasis added).) Coffman also asserted:

> [A]bout 2–3 days a week I will go with my wife to the supermarket or shopping center for 1–2 hours and help her carry some bags in the house. This exhausts me and I have to lie down to rest or nap for 1–2 hours. Occasionally we have some more extensive shopping or errands that take 3–5 hours. I sometimes wait in the car and rest between stops while my wife shops afterward I rest most of the next 1–2 days.

*Id.* Describing his daily activities, Coffman wrote he usually was too exhausted to shower and shave after waking and that he waited until 11:00 to 11:30 a.m., or even as late as 3:00 or 4:00 p.m. to do so.

On December 2, 1997 Dr. Wilkinson submitted a report updating Coffman's file. He noted Coffman improved regarding his chronic nausea and the constant feeling of disequilibrium. He noted Coffman was now able to maintain functions of daily

living around the home but could not drive "with any degree of safety." (*Id.* at 391)(noting also "Automobiles passing in his peripheral vision cause him extreme disorientation and therefore he cannot drive any distance or on any highways with accentuated direction change."). Dr. Wilkinson concluded Coffman could not return to gainful employment or independent activities and that he was essentially dependent on his wife for his care.

Coffman also submitted an updated December 16, 1997 report from Dr. Lapp. Dr. Lapp noted "well-documented" "supporting evidence" of Coffman's condition, including impaired ability to perform stress testing. The report noted "the hazardous severity of [Coffman's] vertigo and vestibular disease, including attention deficit, spatial disorientation, and hyperactive vestibulo-ocular reflexia, all of which are most likely manifestation of his [CFS] and symptoms which are preclusive of reliably safe operation of a motor vehicle or machinery." (*Id.* at 370.) Dr. Lapp also stated:

> At the time of this communication, moderate to severe symptoms are responsible for reducing Mr. Coffman's overall activity level to 30% to 50% of expected, with anomalous limitations in all activities of daily living. He is absolutely incapable of more than one hour of moderate activity, two hours of sitting or reading, 20 minutes of leisurely walking, and has *no tolerance for standing in place.* He must rest and nap for one to two hours once or twice daily despite eight or more hours of sleep at night. He is bed– or couch-bound for up to five days a week. *I judge Mr. Coffman unable to balance, bend, bounce, climb, crawl, finely manipulate, firmly grasp, kneel, reach, squat or stoop, or to lift or carry, push or pull weight greater than 7 pounds.* Nor would he be capable of performing work in physical surround-

ings that require exposure to temperature extremes, noise, vibration, or noxious substances.

(*Id.* at 369–70 (emphasis added).) Dr. Lapp indicated Coffman was totally disabled for "all regular or sustained work, even in brief and sedentary positions." (*Id.* at 370.)

Finally, Dr. Lapp submitted a December 18, 1997 report, following a long distance telephone consultation with Coffman. Coffman relayed to Dr. Lapp his " 'best time of day' " is late afternoon to early evening. Coffman also reported he was functioning only at 20 percent of his former capabilities along with the following information:

> He is a slow starter in the morning and does "little or nothing" prior to 10:00 a.m. On 2 or 3 days of the week he does not shower or shave due to limited expendable energy. *On a good day, he is able to take out the trash and unload the dishwasher. He can "occasionally" vacuum one room in the house, but then may pay the price in "flat on my back" exhaustion for 2 days.... Again, dependent on degree of fatigue, Mr. Coffman can sit for a period of one to two hours, carry in groceries not weighing more than 6 to 8 pounds, and walk briefly at a leisurely pace. Any quick or sustained movement, however, triggers and accentuates not only his fatigue but the vertiginous acuity of his dysfunctional vestibular symptoms for a period varying from one to four days.*

(*Id.* at 373 (emphasis added).) The report also prominently noted "Mr. Coffman is commended for the critical attention he is giving to aggressive rest therapy, limit setting, and lifestyle adjustment in the management of his chronic illness." (*Id.* at 374.)

### 3. The Surveillance Video Record and Subsequent Events

Attempting to verify Coffman's self-reported impairments, MetLife placed him under video surveillance to document his physical activities. InPhoto Surveillance observed Coffman on September 24, 27, 28 and 29, and October 12, 1997. The investigators did not observe any activity on September 24 and 27. That changed, however, on September 28.

On that date, Coffman left home by 9:40 a.m. and drove himself and his wife the 14-minute trip from his house to the Charleston Civic Center to a church activity. The report notes Coffman "parked on the third level of the adjacent parking garage in a handicapped parking space next to the elevators."[1] (*Id.* at 39.) Coffman carried two tote bags into the Civic Center, where he remained for more than seven hours. At 5:07 p.m., Coffman returned to his car carrying the same two bags over his shoulder, along with a small cardboard box. He appears in no apparent discomfort, able to bend and very mobile. At 5:17 p.m., after driving himself and his wife to a restaurant 10 minutes away, he quickly walked through the rain into the restaurant, holding the door for his wife. Surveillance was discontinued at this point.

The very next day, Coffman left home at 11:59 a.m. He drove, with his wife, for about 30 minutes to Sun Appliances ™, where he shopped for approximately 1½ hours. The videotape is difficult to view at this point, as it is attempting to tape Coffman from outside the store. The investigators, however, provide a narrative report of what occurred.:

We entered the store and observed your subject as he walked around the store and looked at car stereos, compact discs, and vacuum cleaners. Two minutes later, we obtained videotape of Mr. Coffman as he looked at the vacuum cleaners. Your subject bent over and picked up a variety of vacuum cleaners as he shopped. At 2:01 p.m., your claimant picked up a vacuum cleaner in a box and carried it to the counter, paid for the vacuum, and then carried the object to the exit. Three minutes later, we obtained videotape of your subject as he exited the store, carried the boxed vacuum cleaner to the back of his vehicle, and [bent and] placed it into the trunk. He entered the driver's seat, while the female entered the passenger's seat, and they departed the area.

(*Id.* at 40.) Although difficult to view, the videotape appears to show Coffman moving about with ease in the store, standing in place, viewing merchandise, and bending. He even appears to step up on a platform and move about with ease.

Coffman did not return home after this outing. He traveled immediately to Taco Bell ™ for lunch. He is shown in short sleeves the entire time. When he arrives at Taco Bell ™, he is seen quickly exiting the car and moving briskly to the door and opening it for his wife. After receiving his order, he carries the tray to his table. He is seen smiling and talking throughout lunch and appears very at ease. At the conclusion of the meal, he dumps his trash, walks briskly and purposefully to the car with his wife, and drives to a nearby Sam's Club ™.

Coffman remains with his wife at Sam's Club ™ for over an hour shopping. He exits the store pushing a large shopping cart full of merchandise. He quickly loads the merchandise into his car and prepares

---

1. Coffman asserts he has a valid permit for handicapped parking and Defendants have not disputed the point.

to leave. This part of the tape is remarkable in light of the medical record. Prior to leaving the parking lot, Coffman is shown getting back out of his car, bending to his knees and then bending at the waist varying at 90˜to 120˜ He performs this bending with half, and sometimes most, of his body leaning inside the car, apparently looking for something under the seat. After spending some time under the front seat, he returns to an upright position and quickly moves to the backseat, again in a strained bending position. Despite over two minutes of bending over in unusual positions, no reorientation difficulties appear. He enters the vehicle and drives away.

On October 12, 1997 more surveillance was taken. Coffman left his house at 10:01 a.m. driving with his wife accompanying him as a passenger. Coffman traveled for 10 minutes to the Kingdom Hall of Jehovah's Witnesses. Once parked, he is seen bent over his vehicle and lifting a large brief box, which he carried into the building. He left two hours later with the same brief box. He traveled to a local Captain D's ™, where he and his wife had lunch for about 45 minutes. He is seen standing in line to order, gets his food, eats and converses over lunch. He then left the restaurant and drove the car to Charleston Area Medical Center. He "parked in the private hospital parking lot in a handicapped parking space. We obtained videotape of him as he and the female walked toward the hospital and entered, out of our view." (*Id.* at 37.) Coffman stayed at the hospital for 1½ hours and then returned home.

The investigative reports submitted to MetLife describe observations of Coffman engaging in various physical activities, including driving, bending, lifting, carrying and walking in a normal, unrestricted manner. They also commented Coffman did not appear to be physically handicapped or disabled and that he did not display any visible signs of mental distress.

On January 5, 1998 MetLife sent Dr. Lapp copies of the surveillance reports. It asked for his review and comments. Dr. Lapp responded two days later by fax:

> In response to your fax of January 5, I see no evidence that is not in keeping with *Mr. Coffman's claimed impairments.* I would very much like to review the videos myself, however. Would you please forward a copy?

(*Id.* at 362 (emphasis added).) On January 12, 1998 MetLife sent Dr. Lapp the tapes and requested further comment:

> In order to properly evaluate this claim for continuation of benefits, we are requesting you review the videos enclosed and provide your comments to our office. If we do not receive a reply to this letter within 30 days, we will assume that you agree with our findings that Mr. Coffman is no longer disabled as defined by his group plan. If you disagree, however, please provide us with specific objective evidence including office notes and any recent testings from October 1, 1997 to the present time, to refute this information.

(*Id.* at 358.) Dr. Lapp received the videotapes on January 16, 1998. He did not respond, however, within the 30 day deadline because he was out of the office for an extended period. Nonetheless, MetLife contacted his office on both February 17 and 27, 1998. Again, MetLife received no written communication as requested.

On March 2, 1998 MetLife wrote Coffman about his claim. MetLife explained the requirements of the Plan for continued LTD benefits, discussed the record in the case to date, and "determined that you are not disabled from performing your normal job duties." (*Id.* at 279.) Benefits were terminated effective October 1, 1997.

On March 4, 1998 Dr. Lapp responded to MetLife's request for review and comments on the videotapes. Dr. Lapp's report largely repeats Coffman's later explanations to MetLife immediately below.

On March 23, 1998 Coffman wrote Met-Life and requested a further review of his claim. The 12–page, single-spaced letter:

1. Criticizes MetLife for the timing of its benefit decision and deadline to Dr. Lapp;

2. States "Dr. Lapp and I do not see any evidence from your 86 minutes of videotape over 5 days of me engaging in any activities that were comparable to performing the duties of my past job …." (*Id.* at 332);

3. Admitted "CFS … is … more difficult to assess than more common illnesses." (*Id.* at 333);

4. Notes his cardiopulmonary exercise stress test demonstrated a significant impairment of functional aerobic work capacity as well as neuroventilatory and—endocrine defects. He also asserted the test showed maximum oxygen consumption was only 61% of predicted for sedentary individuals and his testing showed his "inability to sustain work" (*Id.* at 343);

5. Threatens litigation, asserts he is not covered by ERISA, and promises to pursue common law remedies including bad faith, intentional infliction of emotional distress and punitive damages; [2]

6. Notes the choice between simply paying his benefits or opting for very expensive litigation and queries *"which way does Met Disability prefer to handle my claim and pay me the LTD benefits that I am entitled to, based on my medical proof of disability?"* (*Id.* at 335)(emphasis in original);

7. Cites and discusses over a half dozen federal cases supporting his position;

8. Agrees with Dr. Lapp's assertion "there is no outward evidence of CFS, and persons with CFS generally appear relatively healthy and without any obvious disability" (*Id.* at 336);

9. Cites and discusses pieces of medical literature supporting his claim;

10. Notes "[i]f patients exceed a certain limit of exertion, they pay a price in this type of fatigue or malaise the following day or days to come" (*Id.*);

11. Notes his lengthy and detailed responses have caused him to sit at his computer for hours and days;

12. Asserts that on his better weeks he may only stay home and rest 2–3 days;

13. His September 28 trip outside the house was to a special religious convention that occurs only three times a year and he saved up ener-

---

**2.** Counsel, who both have substantial experience in ERISA matters, have jointly concluded since this action's inception that Coffman's claim arose under an ERISA plan and that his particular claim fell within the Court's subject matter jurisdiction. Coffman's letter asserts, however, his "Voluntary LTD Plan is *employee paid*" and is consequently not covered by ERISA. (*Id.* at 334 (emphasis added).) The issue would not affect the Court's jurisdiction.

It would appear 28 U.S.C. § 1367 would provide supplemental jurisdiction over the LTD claim in light of the federal question jurisdiction over the non-contributory benefit claims. In any event, counsel filed recently a stipulation demonstrating the LTD Plan does not fall within the "safe harbor" provision of 29 C.F.R. § 2510.3–1(j) exempting certain plans from ERISA coverage.

gy to go. After returning home, he asserts he "spent the rest of the evening lying down resting in bed or on the couch as [he] was exhausted and had muscle aches from being out longer than usual." (*Id.* at 338);

14. Notes that during his trip to Sun Appliances™ he purchased and carried not a vacuum cleaner but a lighter "electric broom" (*Id.* at 339);

15. Suggests he was "exhausted" from carrying the box but decided to "push" himself in order to shop at Sam's to avoid another shopping trip; and

16. The two days he was seen driving "happened to be days [he] was not very dizzy and did not have trouble driving the relatively short distances" involved. (*Id.*)

On March 16, 1998 a MetLife DNS performed another follow-up review of Coffman's claim. She noted problems with the claim, but nonetheless recommended independent review by NMR.

Robert D. Petrie, M.D., reviewed the information submitted to MetLife and issued an April 6, 1998 report. Dr. Petrie is a diplomate of the American Board of Preventive Medicine and the American Board of Family Practice. His analysis, at some length, follows:

Although numerous quasi-scientific tests have been provided to support the claim of total disability, the direct observation of Mr. Coffman's activities clearly show that he is not disabled to the extent to which his attending physicians allege. Dr. Charles Lapp, in his December 16, 1997, Functional Capacity Statement, reported significant restriction on transportation. However, direct observation revealed that Mr. Coffman was able to drive his automobile without difficulty, and in fact, does so even when there is a passenger in the vehicle who presumably could be performing these functions. . . .

Unemployment and disability are endorsed by Dr. Charles Lapp. [According to Dr. Lapp's] December 18, 1997 letter . . . . Mr. Coffman is taking several experimental medications including DHEA and C0Q–10 in addition to Ritalin and Effexor. Dr. Lapp indicated that "a review of his laboratory work reveals activated T-cell and depressed suppressor cell population amino dysfunction and characteristic abnormal cardiopulmonary exercise testing, as well as documented exclusionary laboratory work." As clearly noted by the C.D.C. and by several experts in the consensus opinion on chronic fatigue syndrome, there is no demonstrated immune dysfunction in individuals with chronic fatigue syndrome.

In addition, another quasi-medical assessment which has been undertaken is Mr. Coffman's cardiopulmonary exercise test. This is a nontraditional test format which revealed that Mr. Coffman exercised to only 73% of his predicted maximal heart rate. Nonetheless, numerous erroneous conclusions were drawn with regards to his level of cardiopulmonary fitness, based on a test which clearly revealed less than maximal effort. Dr. Lapp speculated, "This was a very unusual study in that the subject never reached 85% of maximum heart rate (possibly due to calcium channel blockers) and due to anxiety (hyperventilation), he started to test with an RQ greater than one. Nevertheless, with these limitations in mind, the study still demonstrates a considerable functional aerobic impairment." The clear explanation for this is that Mr. Coffman exhibited less than maximal effort.

In summary, Mr. Coffman has had numerous tests performed which are of little demonstrated scientific value, and which do not contribute to an understanding of his absence from work, and do not confirm the diagnosis of chronic fatigue syndrome. Dr. Lapp's statements in his September 9, 1997, report indicated that Mr. [Coffman] has "mental fatigue, poor comprehension, difficulty comprehending concepts, inability to recall recent events or conversations, forgetful (lost the hotel key last night), word searching, expressive difficulties (dyslogias), stumbles, malapropisms (can't express thoughts), gets disoriented and confused, having difficulty driving, turns the wrong direction, disoriented, goes the wrong way down one-way streets, misses stop signs (etc.) and new difficulty with math and reasoning; cannot follow a plot in a movie or book" is simply inconsistent with observed activities.

Mr. Coffman is clearly capable of performing the activities of a territorial representative for a pharmaceutical company, and I am in agreement with the reports from Dr. Bertrand, which stated that Mr. Coffman had the ability to perform the duties of his job as a territory representative for Wyeth–Ayerst.

(*Id.* at 322–24.) This report was later sharply criticized by Dr. Lapp, who asserted (1) cardiac drugs taken by Coffman could have prevented his heart rate from accelerating to maximum; and (2) excellent effort was observed given Coffman's blood pressure increased from 120/80 to 200/94 during testing along with similar increases in oxygen pulse and respiratory rate.

On April 8, 1998 MetLife denied Coffman's request for review, asserting the data submitted contained no new or different information relative to the claim. This prompted Coffman to draft another lengthy, detailed letter, this time requesting the AHPC Retirement Committee to review MetLife's decision. The letter discusses his condition, medical treatment, history with MetLife, and his profound frustration with how his claim had been handled.

Coffman followed-up with a July 10, 1998 letter. The letter contained a June 15, 1998 report from Dr. Lapp and a June 8, 1998 letter from Dr. Richards, each one page in length. Dr. Lapp reported, *inter alia*, Coffman "gets dyspnea on minimal exertion." (*Id.* at 637.) The report also observed Coffman could manage 15–30 minutes per day of strenuous activity. He noted Coffman was able to converse with him for 30 minutes without obvious dyspnea. His condition was described as "stable." (*Id.*) Dr. Richards' two-sentence report conclusorily opined Coffman was "totally disabled and unlikely to be otherwise" (*Id.* at 638.)

On July 31, 1998 Coffman submitted a new, favorable decision from the SSA on his disability claim. Coffman noted the ALJ's observation of how well documented and substantial his claim was. The SSA decision also includes the following observations:

1. The medical evidence established a severe combination of impairments including CFS and motion sickness syndrome;

2. Coffman had underlying medically determinable physical and mental impairments that could reasonably be expected to produce his symptoms and his allegations were deemed credible and consistent with the record;

3. Supporting evidence included the presence of the Epstein–Barr virus, immuno dysfunction, and the results

of the cardiopulmonary testing discussed *supra;*

4. Dr. Wilkinson's opinion Coffman could not drive with any degree of safety;

5. Coffman was unable to maintain a balanced stance and moved with some clumsiness and lack of coordination; and

6. Shaving and showering exhausted Coffman.

Based on these and other considerations, SSA awarded Coffman disability benefits commencing November 27, 1996. It appears the findings and conclusions were based in large measure on the opinions of Coffman's physicians and his own self-reporting. It does not appear the surveillance video evidence was before the ALJ.

As requested by Coffman, AHPC exercised its oversight authority as plan sponsor to review MetLife's earlier claims decision. An internal memorandum details Coffman's claim history. It also notes AHPC requested MetLife again fully review the claim. The memorandum recommended the AHPC Retirement Committee deny the appeal for lack of evidence of disability. On January 27, 1999 the Retirement Committee deferred its determination pending further review by the Employee Benefits and Law Departments and outside legal counsel. On April 6, 1999 the Retirement Committee upheld MetLife's determination. On August 20, 1999, after reviewing the information in the appeal file, MetLife also upheld its prior termination decision.

On January 10, 2001 Coffman instituted this action. His four count Amended Complaint asserted claims against both AHPC and MetLife for (1) wrongful denial of benefits (Counts I and III); and (2) violation of the West Virginia Unfair Trade Practices Act (WVUTPA), *West Virginia*

*Code* Sections 33–11–1 *et seq.* (Counts II and IV). Counts II and IV were previously dismissed as preempted by ERISA. *See Coffman v. Metropolitan Life Ins. Co.,* 138 F.Supp.2d 764, 766–67 (S.D.W.Va. 2001).

### B. Standard of Review

■ The standard for review of a decision made by trustees of an ERISA benefit plan generally is *de novo. Firestone Tire & Rubber Co. v. Bruch,* 489 U.S. 101, 115, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989); *Richards v. UMWA Health & Retirement Fund,* 895 F.2d 133, 135 (4th Cir.1990); *de Nobel v. Vitro Corp.,* 885 F.2d 1180, 1186 (4th Cir.1989). Where the plan gives the trustees discretion to determine benefit eligibility or to construe plan terms, however, the standard of review is whether the trustees abused their discretion. *Firestone,* 489 U.S. at 111, 109 S.Ct. 948.

■ Under this standard, a plan administrator's decision will not be disturbed if it is reasonable, even if the reviewing court would have come to a different conclusion independently. *See Feder v. Paul Revere Life Ins. Co.,* 228 F.3d 518, 522 (4th Cir.2000). "[A] decision is reasonable if it is the result of a deliberate, principled reasoning process and if it is supported by substantial evidence." *Ellis v. Metropolitan Life Ins. Co.,* 126 F.3d 228, 232 (4th Cir.1997)(internal quotation marks omitted).

■ Where a plan gives discretion to an administrator or fiduciary who is operating under ·a conflict of interest, however, a reviewing court must also weigh that conflict "in determining whether there [has been] an abuse of discretion." *Firestone,* 489 U.S. at 115, 109 S.Ct. 948; *see Booth v. Wal–Mart Stores, Inc. Assocs. Health & Welfare Plan,* 201 F.3d 335, 342 (4th Cir. 2000). A court then reduces the amount of deference accorded the fiduciary's decision

and determines, based on review of the record before the fiduciary at the time of its decision, whether the decision is consistent with one that might have been made by a fiduciary acting free of the interests that conflict with those of the beneficiaries. *See Ellis,* 126 F.3d at 233 ("[I]n no case does the court deviate from the abuse of discretion standard. Instead, the court modifies that abuse of discretion standard according to a sliding scale. The more incentive for the administrator or fiduciary to benefit itself by a certain interpretation of benefit eligibility or other plan terms, the more objectively reasonable the administrator or fiduciary's decision must be and the more substantial the evidence must be to support it.").

In *Booth,* the Court of Appeals assembled the criteria for determining the reasonableness of a fiduciary's decision. The Court of Appeals concluded consideration was appropriate:

> but ... not limited to, such factors as: (1) the language of the plan; (2) the purposes and goals of the plan; (3) the adequacy of the materials considered to make the decision and the degree to which they support it; (4) whether the fiduciary's interpretation was consistent with other provisions in the plan and with earlier interpretations of the plan; (5) whether the decisionmaking process was reasoned and principled; (6) whether the decision was consistent with the procedural and substantive requirements of ERISA; (7) any external standard relevant to the exercise of discretion; and (8) the fiduciary's motives and any conflict of interest it may have.

*Booth,* 201 F.3d at 342–43; *see also Lockhart v. UMWA 1974 Pension Trust,* 5 F.3d 74, 77 (4th Cir.1993).

Even as delimited by the eighth factor, there are compelling reasons for the deferential standard of review, not the least of which is that it " 'ensure[s] that administrative responsibility rests with those whose experience is daily and continual, not with judges whose exposure is episodic and occasional.' " *Brogan v. Holland,* 105 F.3d 158, 164 (4th Cir.1997).

As noted by the Court of Appeals in *Brogan,* no abuse is present if the decision " 'is the result of a deliberate, principled reasoning process and if it is supported by substantial evidence.' " *Brogan,* 105 F.3d at 161 (quoted authority omitted). *Lockhart* similarly noted the "dispositive principle remains ... that where plan fiduciaries have offered a reasonable interpretation of disputed provisions, courts may not replace it with an interpretation of their own." *Id.* at 77.

■ The Court is cognizant also of the principle that "[t]he Trustees are obligated 'to guard the assets of the trust from improper claims, as well as ... to pay legitimate claims.' " *Brogan,* 105 F.3d at 164 (quoting *LeFebre v. Westinghouse Elec. Corp.,* 747 F.2d 197, 207 (4th Cir. 1984)).[3]

### C. Plan Provisions and Analysis

Regarding discretion, the SPD states:

> [MetLife and AHPC] have discretionary authority under the Group Insurance Program to determine eligibility for benefits and to construe the terms of the respective Plans, as indicated. Any interpretation or determination made pursuant to such discretionary authority shall be given full force and effect, unless it can be shown that the interpreta-

---

3. The Court notes, consistent with its June 19 Order, that Coffman has likely waived any objections to the abuse of discretion standard of review, having not appealed the Magistrate Judge's ruling on that issue.

tion or determination was arbitrary and capricious.

(Ex. C, Defs.' Mot. for Summ. J. at 68.) The Court deems this language sufficient to confer discretion on Defendants to determine benefit eligibility or to construe plan terms. Accordingly, the abuse of discretion standard applies.

The relevant AHPC Summary Plan Description provides as follows:

**Voluntary Long Term Disability Plan**

The Long Term Disability (LTD) Plan is designed to provide protection against loss of income during extended disability. It is available to you on a voluntary basis.

**Total Disability**

During the waiting period (six months) and the first 24 months that LTD benefits are payable, "total disability" means the complete inability to perform the duties of your occupation.

After this 30–month period, "total disability" means the inability to engage in any substantial gainful employment for which you are reasonably fitted by education, training or experience.

You will not be considered totally disabled during any period in which you are gainfully employed in any occupation except for approved rehabilitative employment.

*Medical proof of total disability is required before benefits become payable and will be required periodically during the continuance of your disability.*

(Ex. C, Defs.' Mot. for Summ. J. at 34 (emphasis added).) While the Court considers all of the *Booth* factors equally, some are worthy of extended discussion.

**1. The Language of the Plan**

■ Turning first to the language of the Plan, Coffman asserts it was improper for Defendants to insist upon objective medical evidence of disability when the Plan only requires "[m]edical proof of total disability." Although the word "objective" does not appear in the Plan requirement, that interpretation is not unreasonable under these circumstances. *But cf. Mitchell v. Eastman Kodak Co.,* 113 F.3d 433, 442–43 (3rd Cir.1997)("Although in some contexts it may not be arbitrary and capricious to require clinical evidence of the etiology of allegedly disabling symptoms in order to verify that there is no malingering, we conclude that it was arbitrary and capricious to require such evidence in the context of this Plan and CFS.").

Were an opposite rule to apply, LTD benefits would be payable to any participant with subjective and effervescent symptomology simply because the symptoms were first passed through the intermediate step of self-reporting to a medical professional. If that were so, Defendants would be greatly hampered in exercising their fiduciary role of carefully scrutinizing self-reporting, preventing malingering, and consequently " 'guard[ing] the assets of the trust from improper claims, as well as . . . pay[ing] legitimate claims.' " *Brogan,* 105 F.3d at 164 (quoting *LeFebre v. Westinghouse Elec. Corp.,* 747 F.2d 197, 207 (4th Cir.1984)). Blind adherence to *Mitchell,* then, would render nugatory *Brogan's* emphasis on faithfulness to fiduciary obligations. Accordingly, *Mitchell* and cases like it are thus neither controlling nor persuasive.

**2. The Plan's Purposes and Goals**

Next, the purposes and goals of the Plan are, in part, to provide employees protection against loss of income "during extended disability." The overriding function of the Plan, then, is to assure totally disabled employees are protected financially. Undoubtedly one part of this goal is likewise to assure that where total disability is not

proven, no benefits are paid. This assurance against a raid on the corpus or policy proceeds means all proven claims will be able to be satisfied. A denial of benefits under the circumstances discussed *infra* would thus serve the purposes and goals of the Plan.

### 3. The Adequacy of the Materials Considered and the Degree to Which the Materials Support the Decision

The Court next examines the adequacy of the materials considered to make the decision and the degree to which they support it. From a general perspective, the Court is often called upon to review benefit determinations under ERISA Section 502(a)(1)(B). In that time, it has never encountered so substantial a record as has been developed in this case. Time and again Defendants made decisions based upon lengthy submissions by Coffman and his doctors only to then revisit the issue anew on reconsideration. Opinions of Coffman's treating physicians, most of whom were well-qualified, were considered and analyzed. Additionally, the DNS's reviews were considered. Next, independent, well-credentialed physicians also weighed in on the disability determination. Finally, video surveillance footage was added to the mix. The record materials before Defendants were thus more than adequate to make the disability evaluation.

### 4. Whether the Process Was Reasoned and Principled

The Court next reviews whether the decision making process was reasoned and principled. Two of Coffman's challenges arise under this factor.

First, Coffman asserts he conclusively proved total disability.[4] The conflicting evidence in the record belies that assertion. Indeed, both sides have done a commendable job supporting their cases. Were this action subject to *de novo* review, it would pose a much more difficult task for the reviewer. The modified *Firestone* standard, however, makes the task less onerous.

In particular, Coffman points to Dr. Lapp's CFS and vertigo findings. Those findings, however, are contradicted by other parts of the record. For example, Dr. Lapp concluded Coffman (1) was absolutely incapable of more than one hour of moderate activity; (2) had no tolerance for standing in place; (3) was precluded from safely operating a motor vehicle; and (4) had serious difficulties with memory concentration, comprehension and expression making it difficult for him to even answer questions. In addition to the competing analyses by Drs. Bertrand and Petrie on these points, however, the surveillance video[5] shows Coffman (1) standing in place for periods of time examining merchandise

---

4. Coffman asserts "Defendants carefully avoided creation of any evidence which could support [his benefits] claim." (Reply Br. at 4). He also faults Defendants for not requesting a functional capacity assessment from Dr. Lapp. The Court observes it is Coffman's responsibility, not MetLife's nor AHPC's, to prove his entitlement to benefits.

5. The Court is cognizant of Coffman's concerns about overemphasizing the surveillance evidence in light of its limited temporal scope in comparison with a regular work week. The footage is clearly entitled to some weight, however, especially where it stands in stark contrast to the medical findings of Coffman's

own physicians and his own subjective reporting. For example, one reading the reports of both Dr. Wilkinson and Dr. Lapp would be left with the unmistakable conclusion Coffman would suffer a severe bout of dizziness if bent over for a prolonged period or persisting in an unusual or cramped position. That is precisely what occurred, however, in the Sam's Club parking lot when Coffman bent at the waist, sometimes beyond 90 degrees for over two minutes, at times nearly disappearing into his cramped front and back seats. Despite approximately two minutes in this position, Coffman quickly rose to his feet with no apparent dizziness and drove away. In

and ordering food; (2) engaging in substantial periods of moderate activity; (3) repeatedly operating a motor vehicle in a safe and controlled manner; and (4) drafting remarkably detailed, thorough, logical, and perceptive written review requests to both MetLife and AHPC. The record is additionally replete with reasoned, yet sharply diverging, opinions by medical professionals on both sides.[6] That alone causes this factor to weigh in Defendants' favor.

Second, Coffman challenges the AHPC Retirement Committee review as simply deferring to and adopting MetLife's earlier findings. He cites internal correspondence from a representative of the AHPC Employee Benefits and Law Departments:

> Since AHPC relies on MetLife to adjudicate claims based upon furnished medical evidence and since MetLife has concluded that there was insufficient evidence to establish that Mr. Coffman is disabled as defined in the Voluntary

Third, Coffman raises the specter of *Daubert* and *Kumho*. He has never formally moved for a gatekeeper hearing. Indeed, he devotes just three sentences to the issue in his Proposed Findings of Fact and Conclusions of Law. On the present record, the proffered opinions appear to easily pass muster. As noted, the medical professionals on both sides sharply disagree throughout the record. That disagreement, however, does not necessarily make one side's analysis unreasonable, invalid or unreliable, especially in light of the admitted, difficult diagnostic nature of Coffman's physical complaints. Ironically, it appears the opinions of at least one of Coffman's treating physicians may be open to a *Daubert/Kumho* challenge. (*See* Admin. Rec. at 104 (Dr. Bertrand criticizing Dr. Richardson's reliance on the non-standard and unacceptable care regimen of clinical ecology and further faulting the ELISA/ACT testing for the same reasons.)).

Coffman next asserts the treating physician rule applicable in Social Security cases should be applicable in this context as well. That rule requires greater deference for the expert judgment of a physician who has observed the patient's medical condition over a prolonged period of time. Our Court of Appeals has expressed doubt as to the applicability of the rule in the ERISA context. *See Elliott v. Sara Lee Corp.*, 190 F.3d 601, 607 (4th Cir.1999).

---

sum, the few days of taping are of limited utility in comparison to a full work week. At the same time, they are of great utility in verifying many components of the subjective self-reporting and the corresponding opinions rendered on such self-reporting.

6. The Court has attempted to include as much of the conflicting medical evidence as possible, along with the associated criticisms leveled by both sides against the opposing views of their medical counterparts. While the Court has carefully reviewed these conflicts and criticisms, it is simply not possible to recount all of them herein. Some of Coffman's more serious challenges to the opposing side's views, however, are worthy of discussion.

Coffman faults NMR physicians generally for being biased and controlled by the companies that employ their services. (Pl.'s Mem. in Supp. at 25 (describing NMR as "a shill for insurance defense causes.")). First, Coffman challenges these doctors' qualifications and sources relied upon. Both Bertrand and Petrie, however, appear well-qualified and Coffman has made no showing these two *particular* physicians are improperly biased *in this case*.

Second, Coffman faults Bertrand's and Petrie's failures to personally examine him. That failure, however, is of no great moment. As in *Ellis*, functional capacity assessments were made, and other conclusions drawn, by independent physicians without a personal examination of the claimant. Further, the reviewing physicians closely examined the reports of Coffman's treating physicians in making their determinations. The charge is also curious in light of the fact Dr. Lapp had limited personal contact with Coffman, apparently relying mostly on phone consultations

for diagnostic purposes. The attack on Dr. Bertrand is also curious from another perspective. It was Dr. Bertrand who, on examining new medical evidence, recommended a significant period of disability benefits for Coffman. MetLife and AHPC followed that recommendation.

Long–Term Disability Plan, the Employee Benefits and Law Departments recommend that the Retirement Committee deny Mr. Coffman's appeal.

(Admin. Rec. at 502.) In addition to other concerns, he also faults an earlier internal memorandum which recited a nearly identical summary of facts for claims denial as advanced by MetLife. In sum, he complains AHPC simply embraced MetLife's position without any additional independent review or verification.

Coffman's argument lacks merit. First, AHPC does not appear to have even been required by the SPD to review MetLife's LTD decision. The SPD section on claims review provides requests for review of disability benefits are to be made to MetLife alone. It appears AHPC considered Coffman's request for review simply to ensure he was treated fairly by MetLife, even permitting him to submit additional evidence.

There are indications the review was independent and the product of reasoned consideration. Indeed, the review was delayed by the AHPC Retirement Committee on one occasion to allow further investigation. The later denial of the "appeal" by the Retirement Committee is not necessarily a "rubber stamp" simply because AHPC's summary of the evidence and that of MetLife overlapped in some respects. That might just as well be due to the fact both entities were reviewing the same claim on the same facts.

### 5. Consistency With the Procedural and Substantive Requirements of ERISA

The next consideration is whether the decision was consistent with the procedural and substantive requirements of ERISA. The latter are subsumed in the Court's discussion of the merits of the claims decision. Regarding the procedural requirements of ERISA, there is no indication Defendants acted improperly. For example, 29 C.F.R. § 2560.503–1(h)(1) provides:

> **In general.** Every employee benefit plan shall establish and maintain a procedure by which a claimant shall have a reasonable opportunity to appeal an adverse benefit determination to an appropriate named fiduciary of the plan, and under which there will be a full and fair review of the claim and the adverse benefit determination.

*Id.* As noted *infra,* Defendants went to extraordinary lengths to provide Coffman the process he was due. The process was conducted in a fair and reasonable manner.

### 6. Conflict of Interest

Coffman devotes much effort to the proposition Defendants operated under a conflict of interest. It does not appear a serious conflict exists for AHPC considering it is not the appellate reviewer for LTD benefits. While it had some responsibility to continue comprehensive health and life insurance benefits if Coffman prevailed on his LTD claim, the hefty financial obligation in this case practically attaches to the LTD award and hence MetLife. For that reason, MetLife does have a conflict, given it is responsible for paying benefits to eligible claimants once AHPC pays its Plan premium. From a theoretical standpoint, MetLife could harbor a desire to improve its bottom line by denying benefit payouts.

Assuming such a conflict is present, however, it only serves to reduce the discretion otherwise accorded the fiduciary so as to correct for the improper motive. In reality, there is little to suggest a profit motive drove the decision in this case by either MetLife or AHPC. First, as in *Ellis,* MetLife sought, and Defendants relied upon, the input of well-credentialed,

independent medical professionals. Second, when those medical professionals recommended benefits, even for a significant period of duration, MetLife paid as recommended and AHPC did not apparently object. Third, both fiduciaries considered substantial medical evidence and performed a thorough review at all levels. All of this considered together demonstrates a deliberate, principled reasoning process not infected by impermissible profit motives.[7] As noted in *Ellis*, "As fiduciary, MetLife must serve the best interests of all Plan beneficiaries, not just the best interest of one potential beneficiary." *Ellis*, 126 F.3d at 234.

Based on the extraordinary process afforded Coffman, the quality of the independent medical opinions obtained, and the reviewers' reasoned analyses of the record, the Court concludes an administrator free of a financial conflict of interest would have been justified in denying Coffman benefits. In sum, Defendants' decision was a reasonable exercise of their discretion.

Coffman has failed to show Defendants abused their discretion in denying and terminating his benefits. Accordingly, the Court **GRANTS** Defendants' motion for summary judgment and **DENIES** Coffman's motion for summary judgment.

## II. CONCLUSION

Throughout the substantial administrative record and in the voluminous briefing,

Coffman faults MetLife's and AHPC's determinations, citing competing evidence from the record. That evidence, in some instances, is substantial and convincing in its own right. For example, his favorable ruling from the Social Security Administration is perhaps worthy of some weight.[8] Nonetheless, the Court is not reviewing the matter *de novo*, nor are Defendants in any way bound by the SSA determination, a ruling made under a different factual record and legal standard.

Based on the present record and the parties' submissions, and accounting for an asserted conflict of interest, the Court cannot conclude Defendants acted unreasonably or lacked substantial evidence upon which to base their respective decisions.[9] Accordingly, the inquiry ends. This action is **DISMISSED** and stricken from the docket.

The Clerk is directed to send a copy of this Memorandum Opinion and Order to counsel of record and to post a copy on the Court's website at www.wvsd.uscourts.gov.

---

7. Coffman also asserts the two Defendants "patently cooperated to procure a joint denial in this matter. Should AHPC have paid disability benefits, it would be much more difficult for MetLife to make a contrary denial." (Reply Br. at 3.) That argument again ignores the fact AHPC has no role in the LTD claim process under the SPD. It also is based on speculation.

8. Coffman is wrong in asserting Defendants did not consider the SSA decision. The rec-

ord reflects such consideration. (*See* Admin. Rec. at 612–13.)

9. The Court also stresses that CFS, despite the diagnostic difficulties it presents, could be a basis for awarding LTD benefits under an ERISA plan. The lack of an award in this case is due to a reasoned and principled decision by Defendants' that Coffman was not disabled under the Plan.