**Kathleen Fenn HUFFORD, Plaintiff,**

v.

**HARRIS CORPORATION, as Plan Administrator of the Harris Long Term Disability Plan, Defendant.**

**No. 6:02CV1025–ORL–28DAB.**

United States District Court,
M.D. Florida,
Orlando Division.

May 18, 2004.

John V. Tucker, Anderson & Tucker, St. Petersburg, FL, for Plaintiff.

Alan Harrison Brents, Akerman Senterfitt, Orlando, FL, for Defendant.

### ORDER

ANTOON, District Judge.

Plaintiff Kathleen Fenn Hufford, a former employee of Defendant Harris Corporation ("Harris"), has sued Harris claiming that her long-term disability benefits under the Harris Long–Term Disability Plan ("LTD Plan") were improperly terminated. Plaintiff claims that she is totally disabled and as a result is unable to perform the duties of any occupation. The parties agree that the LTD Plan is governed by the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 *et seq.*, and that Harris is the Plan Administrator. Both parties have filed motions for summary judgment,[1] and both have

---

1. Plaintiff has filed a Motion for Summary Judgment (Doc. 21) and a Memorandum in Support (Doc. 22). Harris has filed a Response (Doc. 28) in opposition to Plaintiff's Motion. Harris has also filed a Motion for Summary Judgment (Doc. 23) and a Memorandum in Support (Doc. 24). Plaintiff has filed a Memorandum in Opposition (Doc. 29) to Harris's Motion. The Court granted Har-

stipulated that these motions will be dispositive of the case because there are no disputed issues of material fact. (Joint Trial Br., Doc. 36, at 1). Because Harris's termination decision was not arbitrary and capricious, summary judgment will be granted in favor of Harris.

### I. Background

The Harris LTD Plan is funded entirely from employee contributions. (Wyse Aff., Doc. 25 ¶ 15). Harris pays no contributions into the LTD Plan, and its general assets are not subject to assessment with respect to Plan liabilities. (Doc. 25 ¶ 15). In accordance with the LTD Plan, Harris delegated to Kemper National Services ("Kemper") the responsibility for making initial claims determinations and deciding initial appeals. (Doc. 25 ¶ 4). However, Harris's Corporate Benefits Administrative Committee ("Committee") remained responsible for final decisions on final appeals. (Doc. 25 ¶¶ 3–4). The Committee is comprised entirely of Harris employees who are not compensated for their participation. (Doc. 25 ¶ 3).

Plaintiff, a senior security coordinator for Harris, was injured in an automobile accident in 1995. Her injuries included two herniated discs in her cervical spine for which she subsequently underwent surgery. Plaintiff continued to work after the accident until she quit on March 26, 1998. Claiming that she could no longer work because of chronic back, neck, and arm pain; headaches; and thinking and memory difficulties, Plaintiff applied for and began receiving benefits under the LTD Plan retroactive to her last day of work. These benefits were paid on the grounds that Plaintiff could not perform the duties of her own occupation—the "own occupation" standard under the LTD Plan.

Plaintiff continued to receive benefits until Kemper terminated Plaintiff's benefits on March 1, 1999, stating that the medical documentation Kemper had received did not substantiate Plaintiff's claim that she was totally disabled from performing her own occupation. (Kemper Admin. R., Ex. A to Doc. 26, at 73–74) [hereinafter Kemper Admin. R.]. Plaintiff appealed the termination, submitting a letter from her treating neurologist, Gary Weiss, M.D., which described Plaintiff's injuries, her restrictions, and his opinion that she was "permanently [and] totally disabled from all work and work related activities." (Kemper Admin. R. 77, 81–82). Plaintiff also provided Kemper with an MRI read by radiologist Marc Shapiro, M.D., and medical records from Dr. Weiss; Earnest E. Seiler III, M.D., her treating psychiatrist; and Scott M. Kaplan, Psy.D., her clinical psychologist. (Kemper Admin. R. 83–146).

In response, Kemper requested a review by one of its independent medical consultants (also known as a peer review physician). (Kemper Admin. R. 149–51, 152–55). Based on that review, which found that Plaintiff was not disabled from performing her own occupation (Kemper Admin. R. 155), Kemper upheld its termination of benefits on May 5, 1999. (Kemper Admin. R. 156–58). In denying the appeal Kemper noted that the medical documentation Plaintiff provided failed to support the opinion of Plaintiff's treating physicians that she was unable to return to her prior position. (Kemper Admin. R. 157).

After her first appeal was denied, Plaintiff filed a second appeal with Kemper including her own description of the pain she was experiencing as well as her im-

---

ris's Motion for leave to reply (*see* Order, Doc. 31), and Harris filed a Reply to Plaintiff's Response (Doc. 32). The Court heard oral argument on the cross-motions on March 3, 2004. (Doc. 41).

paired mental functioning. (Kemper Admin. R. 167–68). She also included a report from Dr. Kaplan, her treating psychologist. (Kemper Admin. R. 161–66). After obtaining another peer review, which concluded Plaintiff was disabled under the terms of the LTD Plan (Kemper Admin. R. 179–82), in August 1999 Kemper reversed its earlier decision and reinstated Plaintiff's benefits retroactively to the date that they were initially terminated. (Kemper Admin. R. 183–84).

After two years of receiving benefits for being unable to perform her own occupation, under the terms of the LTD Plan Plaintiff had to be unable to perform any occupation in order to be considered disabled and continue receiving benefits—the "any occupation" standard. (1995 Summary Plan Descriptions, Ex. B to Doc. 25, at 49). As required by the Harris LTD Plan, Kemper conducted periodic reviews to determine whether Plaintiff continued to be disabled. During its 2001 review, Kemper considered a report from Plaintiff's treating orthopedic surgeon, Richard A. Hynes, M.D., which Kemper believed suggested that Plaintiff might not be disabled. Dr. Hynes's May 31, 2001 report stated:

> I do agree [Plaintiff] is at maximum medical improvement and feel she has a fifteen percent permanent impairment of the whole person based on American Medical Association Guides to the Evaluation of Permanent Impairment.
>
> Her prognosis is good, and we would expect with time any residual symptoms she may have will stabilize and she will be able to manage on a home exercise program and over-the-counter medications.

(Kemper Admin. R. 200). Kemper also reviewed an August 2001 report from Plaintiff's treating psychiatrist, Dr. Seiler, which Kemper believed not to constitute evidence that Plaintiff suffered from a mental or cognitive disability. (Kemper Admin. R. 201A–205). Having received this information from Plaintiff's treating doctors, Kemper requested reviews by two of its independent medical consultants.

After review of the file, these medical professionals determined that available medical evidence did not support Plaintiff's claim that she continued to suffer from a disability. Lawrence Blumberg, M.D., an orthopedic surgeon, concluded in a September 20, 2001 review that there was nothing in Plaintiff's medical record to indicate that she continued to be unable to perform her prior job as a security guard. (Harris Admin. R., Ex. D to Doc. 25, at 391–92) [hereinafter Harris Admin. R.]. In addition, psychologist Lawrence Berstein, Ph.D., reported to Kemper in October 2001 that from a "psychological perspective" the documentation provided did "not contain objective evidence of impairments in functioning, which would prevent [Plaintiff] from performing useful work at this time." (Harris Admin. R. 393–94). After receiving these reports that Plaintiff was no longer disabled and reviewing Plaintiff's file, Kemper terminated Plaintiff's LTD benefit payments as of October 19, 2001. (Kemper Admin. R. 224–26). Kemper advised Plaintiff that her benefits were terminated, stating "based on the lack of objective documentation to substantiate your continued disability, you no longer [meet] the definition under the Plan of being 'Totally Disabled.'" (Kemper Admin. R. 225).

Plaintiff appealed this termination decision to Kemper on November 27, 2001. (Kemper Admin. R. 228). In support of her appeal, Plaintiff submitted reports from three of her treating health care providers. (Kemper Admin. R. 228). Dr. Kaplan, her clinical psychologist, provided a neuropsychological evaluation (Kemper Admin. R. 229–32); Dr. Weiss, her neurol-

ogist, provided a letter and a neurologic examination (Kemper Admin. R. 233–35); and Dr. Hynes, her treating orthopedic surgeon, also provided a statement and report. (Kemper Admin. R. 236–45).

After receiving these additional reports, Kemper again relied on a medical consultant to assist in reviewing Kemper's decision to terminate Plaintiff's LTD payments. Vaughn Cohan, M.D., a neurologist, reported that based on his review of Plaintiff's medical records, there was no "objective evidence sufficient to support a claim of disability for a sedentary (any) occupation." (Harris Admin. R. 400–02). Dr. Cohan stated that the records of Plaintiff's treating physicians did not support a claim for total disability, noting Dr. Hynes's description of Plaintiff's improved condition as of October 11, 2001. (Harris Admin. R. 401). On January 21, 2002, Kemper upheld its termination decision, explaining that "the submitted documents did not include sufficient objective evidence to substantiate significant functional impairments that would prevent [Plaintiff] from performing any occupation." (Kemper Admin. R. 246–47).

Plaintiff filed a second appeal to Kemper with the assistance of counsel in February 2002. (Kemper Admin. R. 250–51). In this appeal Plaintiff again submitted medical records from her treating physicians, Drs. Hynes, Weiss, and Seiler. (Kemper Admin. R. 266–73; 274–78; 279–80). She also provided a neurosurgical consultation report from neurosurgeon Linda I. Bland, M.D. (Kemper Admin. R. 281–84). As a part of the appeal, Plaintiff's counsel advised Kemper of its failure to consider all of the medical data pertaining to Plaintiff's disability, most notably evidence outside Kemper's interpretation of what constituted "objective medical evidence" under the Plan. (Kemper Admin. R. 260–62).

In response to this appeal Kemper consulted three different peer review physicians. Martin Mendelssohn, M.D., an orthopedic surgeon, did a review of Plaintiff's medical records and concluded that while there was evidence of Plaintiff's subjective complaints, there was a "lack of significant objective findings." (Kemper Admin. R. 288). According to Dr. Martin Mendelssohn's April 2002 report, the records "fail to support a functional impairment that would preclude the claimant from any occupation beginning [October 20, 2001]." (Kemper Admin. R. 288). Elana Mendelssohn, Psy. D., a neuropsychologist, also reviewed Plaintiff's records, observing that the medical reports on file did "not support any functional impairment that would prevent [Plaintiff] from performing any occupation." (Kemper Admin. R. 290). Referring to Dr. Kaplan's report, Dr. Elana Mendelssohn noted that "there was no documentation describing how [Plaintiff's] emotional difficulties specifically interfere with her functionality." (Kemper Admin. R. 290). Dr. Elana Mendelssohn also reported that it was unclear how Dr. Kaplan reached his conclusions as "there was no objective data specifically related to these issues." (Kemper Admin. R. 290). Gerald Goldberg, M.D., a neurologist, also conducted a review of Plaintiff's medical records pursuant to Kemper's request and reported: "[f]rom a neurological standpoint based on Dr. Hynes' notes[,] there are no focal neurological deficits and from a neurological standpoint there would not appear to be any objective findings to document that the [Plaintiff] is unable to perform in any occupation." (Kemper Admin. R. 298). Based on these medical reports, Kemper again upheld its decision to terminate Plaintiff's LTD benefits on May 1, 2002. (Kemper Admin. R. 291–94).

On June 13, 2002, Plaintiff submitted another appeal of the termination of her LTD benefits to Kemper; Kemper forwarded this appeal to Harris, in its capacity as Plan Administrator, for final determination. (Kemper Admin. R. 300–01; 306E). As a supplement to her record on appeal, Plaintiff submitted a vocational evaluation done by Michael K. Bannon, a vocational rehabilitation consultant, concluding that Plaintiff was incapable of any employment. (Kemper Admin. R. 302–04). To facilitate its evaluation of Plaintiff's appeal, Harris obtained the opinions of four more medical experts—making a total of ten health care providers consulted by or on behalf of the LTD Plan. (*See* Harris Admin. R. 634–36). None of the four additional peer review physicians corroborated Plaintiff's claim that she was disabled from performing any occupation.

Robert K. Dawes, Psy.D., a clinical psychologist, submitted a report stating that there was insufficient documentation showing that Plaintiff had a severe enough psychiatric condition to support her claim that she could not perform any occupation. (Harris Admin. R. 437–38). Dr. Dawes found that the conclusions drawn by Dr. Kaplan were flawed and that the data available, if properly considered, would lead to contrary conclusions regarding Plaintiff's alleged disability. (Harris Admin. R. 437–38). He summarized his review by stating, "it is my opinion that the documentation demonstrates that the [Plaintiff] is cognitively able to perform at some level of employability as per the definition of disability for any work." (Harris Admin. R. 438).

Henry Spira, M.D., a neurologist, also submitted a report of his review of Plaintiff's records (Harris Admin. R. 442–44). Dr. Spira noted an absence of objective neurological findings supporting a conclusion that Plaintiff suffers from a functional impairment preventing her from working in any occupation. (Harris Admin. R. 444).

W. Scott Nettrour, M.D., an orthopedic surgeon, reached the same conclusion as a result of his review of Plaintiff's medical file and submitted a report to Harris July 23, 2002. (Harris Admin. R. 589–95). Dr. Nettrour noted an absence in the records of any "focal neurological deficits." (Harris Admin. R. 590). The doctor also opined that "[t]here was nothing in the records reviewed that would preclude [Plaintiff] from performing sedentary duty with allowances made for frequent position changes. There were no hard physical exam findings that would support total disability. [Plaintiff] would be capable of returning to work with no lifting greater than 10 pounds on a repetitive or continual basis." (Harris Admin. R. 590). After submitting his initial report, Dr. Nettrour was asked to review Mr. Bannon's vocational evaluation of Plaintiff. (Harris Admin. R. 613). Dr. Nettrour submitted a supplemental report stating that his review of Mr. Bannon's vocational evaluation did not alter his opinion that Plaintiff was not totally disabled under the LTD Plan. (Harris Admin. R. 613).

The fourth expert to provide an opinion to Harris was James Wallquist, M.D., also an orthopedic surgeon. (Harris Admin. R. 439–41; Kemper Admin. R. 432–34). Dr. Wallquist's report was somewhat ambiguous. At the beginning of his report, Dr. Wallquist checked the statement indicating that there was medical evidence to support Plaintiff's claim of functional impairments precluding her from working. (Kemper Admin. R. 433). In addition, his stated determination was as follows: "Based on review of the medical documentation provided, there is sufficient documentation that would preclude [Plaintiff] from performing the core elements of any occupation from [October 20, 2001] for-

ward." (Kemper Admin. R. 433). However, in explaining the reasoning behind his determination, Dr. Wallquist's characterization of the medical documents provided by Plaintiff indicated that this documentation was not sufficient to support Plaintiff's claim. (Kemper Admin. R. 433).

This ambiguity was compounded by the concluding paragraph at the end of Dr. Wallquist's report. Dr. Wallquist stated:

> In conclusion, based on purely objective neuromuscular exam findings and diagnostics, there are insufficient findings to support total disability from any and all occupations. [Plaintiff's] neuromuscular condition appears to be fixed, chronic and stable over time without objective documentation of progressive worsening to warrant additional diagnostic testing and/or surgery. Therefore, given this broader definition, the medical documentation, especially the report from Mr. Michael Bannon, the vocational rehab consultant, supports total disability from any and all occupations.

(Harris Admin. R. 441).[2] Because Dr. Wallquist inexplicably references a "broader definition," the Harris Committee Interpreted his report as follows:

> One physician reviewer, Dr. James Wallquist, in response to [Plaintiff's] attorney's contention that subjective complaints are sufficient, in and of themselves, and without objective medical findings to support them, to establish a disability under the plan, concluded that [Plaintiff] would be disabled under such a definition of disability. However, as did all of the other peer reviewers, Dr.

Wallquist found no objective medical evidence supporting such a disability. As the Harris Plan does not allow disability to be found solely on the basis of subjective complaints, the relevant conclusion from Dr. Wallquist's peer review is the lack of objective medical evidence to support a disability.

(Harris Admin. R. 636 n. 1). Thus, the Committee ultimately resolved the apparent internal inconsistency in Dr. Wallquist's report in favor of denying Plaintiff's claim.

When the Harris Committee met to consider Plaintiff's appeal, it reviewed all available materials, including Kemper's administrative file on the Plaintiff; all of the medical documentation and information submitted by Plaintiff; and all ten of the peer review physicians' reports. (*See* Harris Admin. R. 634–35). With the possible exception of Dr. Wallquist, the ten independent medical consultants all concurred that Plaintiff had not presented objective medical evidence that her claimed disability prevented her from performing any occupation. Based on the evidence before it, on July 30, 2002, the Harris Committee voted unanimously to deny Plaintiff's appeal and terminate her LTD benefits. (Wyse Aff., Doc. 25 ¶ 12). The Committee advised Plaintiff of its decision and its reasoning as follows:

> Based on the medical documentation provided—and based on the numerous peer reviews undertaken by neurologists, orthopedic surgeons, and psychologists, every single one of which found no

---

**2.** The last sentence, in which Dr. Wallquist gives significant weight to Mr. Bannon's report, was in Dr. Wallquist's unsigned interim report but was deleted from Dr. Wallquist's final signed report. (*See* Kemper Admin. R. 434). In support of its motion for summary judgment, Harris has submitted an affidavit of Dr. Wallquist that states: "This sentence did not accurately reflect my conclusions regard-

ing [Plaintiff]. Accordingly, in reviewing th[e] preliminary draft report, I deleted this sentence." (Wallquist Aff., Ex. 1 to Doc. 23 ¶ 6). However, the Harris Committee had only the unsigned interim report when it decided Plaintiff's final appeal; neither the final signed report nor the affidavit were received or considered by the Committee.

objective medical documentation supporting your continued disability—the Committee concluded that there is no objective medical evidence to support your continued total disability after October 19, 2001.

(Harris Admin. R. 640). Harris's final determination that Plaintiff's LTD benefits were properly terminated was dated August 7, 2002. (Harris Admin. R. 633). Plaintiff filed the present cause of action in this Court shortly thereafter. (Doc. 1).

## II. Standards of Review

### A. Summary Judgment

Summary judgment "shall be rendered forth with if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). As stated above, the parties agree that there are no disputed issues of material fact. (Joint Trial Br., Doc. 36, at 1). Thus, the Court must determine which party is entitled to judgment as a matter of law based on the undisputed record.

### B. ERISA

In deciding whether an employee has been improperly denied disability benefits under ERISA, it is necessary to first determine what standard of review is to be applied. A standard of review for challenges to benefit eligibility determinations is not prescribed by ERISA itself and has evolved as a matter of federal common law. See Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 109, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989). Applying principles of trust law, the United States Supreme Court in Firestone held that a denial of benefits "is to be reviewed under a de novo standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility

for benefits or to construe the terms of the plan." Id. at 115, 109 S.Ct. 948. After Firestone, the Eleventh Circuit adopted three standards for reviewing a plan administrator's decision: "(1) de novo where the plan does not grant the administrator discretion[;] (2) arbitrary and capricious when the plan grants the administrator discretion; and (3) heightened arbitrary and capricious where there is a conflict of interest." Buckley v. Metro. Life, 115 F.3d 936, 939 (11th Cir.1997). The standard of review that is found to be applicable in a particular case applies equally to both legal and factual determinations. E.g., Shaw v. Conn. Gen. Life Ins. Co., 353 F.3d 1276, 1285 (11th Cir.2003) ("[O]ur Court has already declined to draw a distinction between law and fact in choosing the standard of review for denial of ERISA benefits."), reh'g and reh'g en banc denied, Table 99 Fed.Appx. 884, 2004 WL 503608 (11th Cir.2004).

In the present case, the parties agree that the arbitrary and capricious standard applies to Harris's termination decision because the LTD Plan grants Harris discretion in making benefits determinations and Harris does not suffer from a conflict of interest. (Pl.'s Mem. in Supp. of Summ. J., Doc. 22, at 4; Def's Mem. in Supp. of Summ. J., Doc. 24, at 3). The Court agrees with the parties. At all times relevant to this case the LTD Plan expressly granted Harris, the Plan Administrator, complete discretion in deciding claims made for long-term disability benefits. The 1995 "Employee Benefit Plans: Summary Plan Descriptions" ("SPD") provides:

The Plan Administrator will be the sole judge of the standard of proof required in any case regarding the application and interpretation of these plans. Decisions of the Plan Administrator will be final and binding. The Plan Administrator makes decisions and resolves conflicts regarding claims for benefits, the

operation of the plans, and the interpretation of plan documents. The Plan Administrator may delegate these responsibilities and authority to a third party. ... If a decision of the Plan Administrator (or designee) is challenged in court, that decision will be upheld unless it is determined to be arbitrary or capricious.

(1995 SPD, Ex. B to Doc. 25, at 125). The grant of discretion to Harris and the Plan's intent that Harris's decisions be reviewed under the "arbitrary and capricious" standard are reiterated in the 2001 SPD, which provides:

The Plan Administrator has discretionary authority to interpret the terms of the plans and to determine eligibility and entitlement to plan benefits in accordance with those terms. The Plan Administrator makes decisions and resolves conflicts regarding claims for benefits, the operation of the plans[,] and the interpretation of plan terms. The Plan Administrator may delegate some of these responsibilities and authorities to one or more third parties.

Any interpretation or determination made under the Plan Administrator's discretionary authority is to be given full force and effect unless it can be shown to be arbitrary or capricious.

(2001 SPD, Ex. C to Doc. 25, at 129). The LTD Plan's grant of discretion makes arbitrary and capricious the appropriate standard of review unless Harris has a conflict of interest.

As stated above, the Harris LTD Plan is self-funded through contributions made by employees, and the Harris employees who serve on the Committee receive no financial benefit for their service. (Doc. 25 ¶¶ 3, 14). Committee members do not receive any additional compensation and have no financial interest in the outcome of LTD Plan claims. (Doc. 25 ¶¶ 3, 14). In other words, Committee members—the final decisionmakers under the LTD Plan—

do not have any incentive to deny benefit claims. (Doc. 25 ¶ 14). Therefore, Harris does not have a conflict of interest and the arbitrary and capricious standard will be applied in this case. Under this standard, "the function of a reviewing court is to discern whether there was a reasonable basis for the [termination of benefits] decision, relying on the facts known to the administrator at the time the decision was made." *Buckley,* 115 F.3d at 941.

### III. The Merits of The Parties' Motions

■ The ultimate issue in this case which the parties agree must be decided as a matter of law is whether under the arbitrary and capricious standard Harris unreasonably terminated the LTD benefits that Plaintiff was receiving. Plaintiff makes several arguments as to why Harris's termination decision was unreasonable. First, Plaintiff asserts that Kemper and Harris improperly required Plaintiff to submit "objective medical information" in support of her disability claim. The basis of this argument is that the 1995 version of the LTD Plan in effect when Plaintiff began her employment with Harris did not include the "objective medical information" standard as the applicable burden of proof. Plaintiff maintains that the requirement of objective medical information first appeared in the 2001 version of the Plan and that she was never provided with the 2001 version or notified of the change. Plaintiff claims that nonetheless the objective medical Information standard was applied to her case when the Harris Committee denied her final appeal. Plaintiff points to Harris's statement in its decision to uphold termination that "the Committee concluded that there is *no objective medical evidence* to support your continued total disability after October 19, 2001." (Harris Admin. R. 640) (emphasis added). Plaintiff argues that it was arbitrary and capricious for Harris to deny her claim for long-

term benefits using the requirement of "objective medical information" contained in the 2001 version of the LTD Plan.

The 1995 Summary Plan Descriptions defined "total disability" after the "own occupation" period as being "unable to perform the duties of any occupation [that] you are or may become reasonably qualified for by training, education, background[,] or experience." (1995 SPD, Ex. B to Doc. 25, at 49). The 1995 SPD stated that a claim of total disability "must be supported by current medical evidence," (Ex. B to Doc. 25, at 48), and that "satisfactory proof of [a] claim" is required (Ex. B to Doc. 25, at 49). In the "Applying for Benefits" section, the 1995 SPD further explained that proof of disability "may include doctor's records, x-rays[,] and narrative reports." (Ex. B to Doc. 25, at 49).

The 2001 Summary Plan Descriptions' definition of disability is substantially the same, but states that a claim of disability "must be supported by current objective medical information." (2001 SPD, Ex. C to Doc. 25, at 47). The 2001 SPD then explains that the term "Objective Medical Information—includes diagnosis, chart notes, lab findings, test results, x-rays[,] and other forms of medical evidence of disability." (Ex. C to Doc. 25, at 47).

Plaintiff maintains that it was unreasonable for the Committee to require objective medical information because the 1995 Plan did not specifically require such "objective" proof. The real issue presented by Plaintiff's argument is whether it is reasonable for a plan administrator to require objective medical evidence of disability even in the absence of the word "objective." Plaintiff is effectively arguing that subjective complaints of conditions causing disability are sufficient to demonstrate a disability under the 1995 LTD Plan. In other words, Plaintiff contends that it was improper for the Harris Committee to disregard her documented subjective complaints to her treating physicians because of a real or perceived need for objective medical evidence. Harris responds that objective evidence is always required because claims for disability benefits cannot be honored based on mere subjective complaints.

While the term "objective medical information" was never used in the 1995 SPD, the term "medical evidence" was used and examples of specific types of evidence were noted. Plaintiff failed to provide Kemper or Harris with medical testing results, such as X-rays and MRIs, that may have corroborated her claim of chronic neck, back, and arm pain. Likewise, she failed to provide neuropsychological test scores that may have confirmed her complaint of diminished cognitive functions. Plaintiff is not deterred by this lack of objective medical information. To the contrary, she argues that it is irrelevant whether her subjective complaints of symptoms are corroborated by such medical evidence.

It is difficult to understand how a long term-disability plan would survive if Plaintiff's assessment of what is required in the way of proof was correct. The Plan would be open to fraudulent abuse if all that was required for receipt of LTD benefits was the subjective complaints of a claimant. A plan administrator would be prohibited from denying any claim by a claimant who insisted that her conditions were severe enough to prevent her from working. Claims of those who exaggerate or even fabricate their claims of disability would be treated the same as those who present valid medical corroboration of medical deficits. Under such a system, no claims could be denied. For these reasons alone, it is reasonable for a Plan to require "objective medical information" in support of a claim for long-term disability as Harris did in deciding Plaintiff's claim.

Case law supports the conclusion that it is reasonable for a plan administrator to require objective medical evidence even where the plan does not specifically contain such a requirement. Where a plan requires proof of continued disability, "the very concept of proof connotes objectivity." *Maniatty v. UNUM Provident Corp.*, 218 F.Supp.2d 500, 504 (S.D.N.Y.2002), *aff'd*, 62 Fed.Appx. 413, 2003 WL 21105390 (2d Cir.), *cert. denied*, —— U.S. ——, 124 S.Ct. 431, 157 L.Ed.2d 310 (2003). "Were an opposite rule to apply, LTD benefits would be payable to any participant with subjective and effervescent symptomology simply because the symptoms were first passed through the intermediate step of self-reporting to a medical professional." *Coffman v. Metro., Life Ins. Co.*, 217 F.Supp.2d 715, 732 (S.D.W.Va.2002), *aff'd*, 77 Fed.Appx. 174, 2003 WL 22293610 (4th Cir.2003). In the absence of a requirement of objective evidence, the review of claims for long-term disability benefits would be "meaningless because a plan administrator would have to accept all subjective claims of the participant without question." *Williams v. UNUM Life Ins. Co. of Am.*, 250 F.Supp.2d 641, 648 (E.D.Va.2003). Furthermore, the fiduciary role of the plan administrator of scrutinizing claims, protecting the assets of a plan, and paying legitimate claims would be seriously compromised. *Coffman*, 217 F.Supp.2d at 732; *see also Bailey v. Provident Life & Accident Ins. Co.*, No. 3:99-CV-394, 2000 WL 33980014, at *4 (N.D.Fla. June 13, 2000) ("[R]eliance on [subjective] complaints, without more, would result in insurance companies paying virtually all claims. [The insurance company] owes its policy-holders a duty to investigate and seek objective support for the claimant's subjective complaints.").

In ruling that the Committee's insistence on objective medical evidence is reasonable, contrary decisions by other courts cited by Plaintiff have not been overlooked. These cases are distinguishable and, thus, not persuasive under the circumstances presented here. *Mitchell v. Eastman Kodak Co.*, 113 F.3d 433 (3d Cir.1997), and *Cook v. Liberty Life Assurance Co. of Boston*, 320 F.3d 11 (1st Cir. 2003), dealt with claims of chronic fatigue syndrome ("CFS"), a disease that is difficult to diagnose and document. In *Mitchell* the Third Circuit found that it was unreasonable to require the claimant to provide clinical evidence of the etiology of CFS because the disease has no known etiology. 113 F.3d at 443. Likewise, in *Cook*, the First Circuit stated that the nature of CFS made it unreasonable to require clinical objective evidence that the plaintiff was suffering from the disease. 320 F.3d at 21.

The reasoning in these cases was based on the nature of CFS, the presence of which is difficult, if not Impossible, to prove or disprove through objective testing. *Mitchell*, 113 F.3d at 443 ("It is now widely recognized in the medical and legal communities that 'there is no "dipstick" laboratory test for chronic fatigue syndrome.'") (quoting *Sisco v. U.S. Dep't of Health & Human Servs.*, 10 F.3d 739, 744 (10th Cir.1993)); *Cook*, 320 F.3d at 21 (reviewing case law discussing the difficulty associated with diagnosing CFS); *see also Clausen v. Standard Ins. Co.*, 961 F.Supp. 1446, 1456 (D.Colo.1997) ("No [objective] test exists for diagnosing CFS. Instead, the medical community relies on an operational diagnosis technique involving testing, the matching of a detailed list of symptoms, the exclusion of other possible disorders, and a thorough review of the patient's medical history.") (quotations and citations omitted). Both courts recognized that in the context of other diseases, requiring objective evidence would be entirely appropriate and reasonable. *Mitchell*, 113 F.3d at 442–43 ("[I]n some contexts it may not be arbitrary and capricious to

require clinical evidence of the etiology of allegedly disabling symptoms in order to verify that there is no malingering ....."); *Cook*, 320 F.3d at 21 ("In many instances, such a requirement [of evidence independent of the claimant's reporting of symptoms] would be justified."). In the instant case, Plaintiff does not claim to suffer from a disease that is difficult to diagnose and document through objective medical evidence;[3] as stated above, she attributes her disability to a back injury and cognitive function impairment.

*Duncan v. Continental Casualty Co.*, No. C–96–2421, 1997 WL 88374 (N.D.Cal. Feb. 10, 1997), *Ace v. Aetna Life Insurance Co.*, 139 F.3d 1241 (9th Cir.1998), and *Connors v. Connecticut General Life Insurance Co.*, 272 F.3d 127 (2d Cir.2001), are also critical of a plan administrator's requirement of objective evidence in the absence of such a provision in the plan. However, these cases are also inapposite. *Duncan* involved an insurer defendant, and the court applied California insurance law requiring that ambiguous policy terms be interpreted in favor of the policy holder. 1997 WL 88374 at *4. In addition, the plaintiff in *Duncan* was claiming to be disabled based on either fibromyalgia or chronic pain syndrome, which (as stated above) are difficult to objectively document. *Id.* at *5 ("[M]edical conditions that do not give rise to hard laboratory facts or data may still be cognizable claims."). *Ace* also involved an insurance company defen-

dant as opposed to a self-funded plan. 139 F.3d at 1243. There, the Ninth Circuit found that the insurance company's internal guidelines required it to consider an insured's subjective complaints even without objective medical evidence. *Id.* at 1245 n. 11. Moreover, the court found that there was objective evidence supporting the claim that was overlooked by the insurer. *See id.* at 1245–47. Finally, *Connors* held that subjective complaints of pain must be considered in evaluating a claim of disability but do not have to be accepted as credible. 272 F.3d at 136.

■ Plaintiff also relies on *Smith v. Continental Casualty Co.*, 276 F.Supp.2d 447 (D.Md.2003) in support of her position that even in a case not involving fibromyalgia or CFS, a plan administrator cannot deny a claim solely on the basis of a lack of objective medical evidence. The *Smith* court held that once objective medical evidence establishes an underlying impairment that could cause pain, " 'the absence of objective medical evidence of the intensity, severity, degree[,] or functional effect of pain is not determinative.' " *Id.* at 454 (quoting *Hyatt v. Sullivan*, 899 F.2d 329, 337 (4th Cir.1990)). The court stated that while a claim administrator may reject complaints of pain for credibility reasons, before doing so the administrator must consider a list of enumerated factors. *Id.* at 455. These factors include:

---

**3.** Cases involving claims of disability based upon fibromyalgia would likewise be distinguishable based upon the difficulty associated with diagnosing and documenting fibromyalgia. As explained by the Seventh Circuit in *Hawkins v. First Union Corporation Long–Term Disability Plan*:

[F]ibromyalgia, "also known as fibrositis [is] a common, but elusive and mysterious, disease, much like chronic fatigue syndrome, with which it shares a number of features. Its cause or causes are unknown,

there is no cure, and, of greatest importance to disability law, its symptoms are entirely subjective. There are no laboratory tests for the presence or severity of fibromyalgia. The principal symptoms are 'pain all over,' fatigue, disturbed sleep, stiffness, and—the only symptom that discriminates between it and other diseases of a rheumatic character—multiple tender spots...."

326 F.3d 914, 916 (7th Cir.2003) (quoting *Sarchet v. Chater*, 78 F.3d 305, 306–07 (7th Cir.1996)).

[T]he claimant's work history; observations of the claimant by third parties, such as coworkers and superiors; the professional opinion of treating and examining physicians; the claimant's history of pain management and drug therapy; the dosage, effectiveness, and side effects of medications; the claimant's reputation for truthfulness; the consistency (or lack thereof) in the claimant's own statements; the congruity (or lack thereof) between the reported symptoms and the claimant's daily activities.

*Id.* Plaintiff contends that under *Smith* Harris's termination of her LTD benefits was unreasonable because there is nothing in the record to indicate that Harris weighed Plaintiff's credibility with regard to "non-exertional impairments" such as pain, headaches, and concentration problems. Such a weighing of credibility is essential, according to Plaintiff, because these symptoms complained of by Plaintiff are not objectively verifiable.

The argument that the Committee abused its discretion by failing to consider and rule upon Plaintiff's credibility is not persuasive. The scope of the administrative inquiry mandated by *Smith* would place an onerous and unrealistic burden on plan administrators, especially in the case of self-funded plans exercising discretionary authority. In order to make a meaningful assessment of Plaintiff's credibility, the Committee would have had to have conducted a trial of sorts allowing the Plaintiff and others to testify in order to hear and test the truthfulness of the witnesses. Such a procedure is not contemplated by the Plan. For this reason *Smith* is in conflict with an overwhelming amount of authority to the contrary. In sum, the court is not persuaded by *Smith* or other case law authority proffered by Plaintiff on this issue.

■ Plaintiff next asserts that even if the "objective medical information" stan-dard was properly applied to her claim of disability, Harris's termination of her LTD benefits was unreasonable because she did in fact submit objective medical evidence demonstrating that she met the definition of disability under the LTD Plan. In reaching a contrary conclusion, Plaintiff argues that the Harris Committee gave too much weight to the opinions of the peer review physicians and did not give sufficient weight to the opinions of her treating health care providers. Plaintiff takes the position that the only reliable medical evidence before the Committee came from her doctors and established her disability. In contrast to the opinions of the medical consultants, Plaintiff contends that the opinions of her treating doctors were supported with sufficient detail to make them reliable. She asserts that the reports of the peer review physicians should not have been considered by the Harris Committee at all because they do not pass *Daubert* scrutiny—meaning they lack sufficient indicia of reliability to be considered credible. *See Daubert v. Merrell Dow Pharms., Inc.,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). Plaintiff maintains that because the peer reviewers were paid by Harris, their opinions are of limited value and should not be given the same weight as those of her treating doctors. Plaintiff argues that even if it was proper for the Committee to consider the peer review reports finding that she was not disabled, Harris improperly gave them more weight than it did the opinions of Plaintiff's treating health care providers. Plaintiff asserts that before discounting the reports of her treating physicians, the Committee was compelled to have Plaintiff physically examined by a physician of its choice.

■ However, contrary to Plaintiff's assertion, plan administrators are not required to give special deference to the

opinions of treating physicians. *Black & Decker Disability Plan v. Nord,* 538 U.S. 822, 825, 123 S.Ct. 1965, 155 L.Ed.2d 1034 (2003). In *Black & Decker,* the United States Supreme Court held that "courts have no warrant to require administrators automatically to accord special weight to the opinions of a claimant's physician; nor may courts impose on plan administrators a discrete burden of explanation when they credit reliable evidence that conflicts with a treating physician's evaluation." *Id.* at 834, 123 S.Ct. 1965; *see also Shaw v. Conn. Gen. Life Ins. Co.,* 353 F.3d 1276, 1287 (11th Cir.2003) (reversing district court under *Black & Decker* for giving special weight to the opinion of the claimant's treating physicians). Moreover, there is no requirement in the Plan that the administrator obtain an independent medical examination to rebut the opinion of a claimant's treating physician. It is entirely appropriate for an administrator to rely on written reports of consultants who have done paper reviews of a claimant's medical records, even if those reports rebut the opinion of the treating physicians asserting claimant is disabled. *Donato v. Metro., Life Ins. Co.,* 19 F.3d 375, 380 (7th Cir.1994) ("[The plan administrator's] decision simply came down to a permissible choice between the position of [the administrator's] independent medical consultant, and the position of [the plaintiff's] clinical ecologists ...."); *cf. Johnson v. N.Y. Life Ins. Co.,* No. 00–CV–210, 2001 WL 1736879, at *7 (M.D.Fla. Aug. 31, 2001) (suggesting that failure to obtain outside review of a claimant's medical records would be unreasonable and a breach of administrator's fiduciary duties).

██ Next, Plaintiff argues that it was arbitrary and capricious for the Committee to terminate her benefits in light of the unrebutted report from Mr. Bannon, her vocational rehabilitation specialist, opining that she was incapable of working in any occupation. While the Eleventh Circuit has not weighed in on the issue, "[i]n considering the 'any occupation' standard, other Courts of Appeals have held that consideration of vocational evidence is unnecessary where the evidence in the administrative record supports the conclusion that the claimant does not have a disability which prevents him from performing some identifiable job." *Schindler v. Metro. Life Ins. Co.,* 141 F.Supp.2d 1073, 1082 (M.D.Fla.2001). When, as here, the evidence shows that a claimant is capable of light and sedentary work and the claimant's previous employment was not highly skilled or technical, the plan administrator need not conduct a vocational assessment or consider vocational evidence to determine that the claimant is disabled under the "any occupation" standard. *Id.* at 1083; *Archible v. Metro., Life Ins. Co.,* 85 F.Supp.2d 1203, 1220 n. 13 (S.D.Ala.2000).

██ Plaintiff also complains that the Harris Committee abused its discretion by conducting a superficial review of her claim and failing to address important aspects of her claim in its written denial of her final appeal. She complains that both the peer review physician's reports and the Committee's decision neglect to even mention the impact of her prescription medications. However, Harris's review included peer review reports from ten independent medical experts. This can hardly be considered superficial. The medicinal side effects about which Plaintiff complained were included in the reports of her health care providers and were before the Committee during its final review. Moreover, the reports from Plaintiff's treating doctors do not support her claim that she could not work due to the effects of her medications. Only Mr. Bannon, who is not a medical expert, opined that medication prevented Plaintiff from working. None of Plaintiff's doctors joined in this assessment. Plaintiff took Methadone for pain,

but Dr. Weiss, Plaintiff's treating neurologist, repeatedly recommended that Plaintiff discontinue this treatment. (Harris Admin. R. 291, 344, 362). In addition, Dr. Hynes, Plaintiff's treating orthopedic surgeon, opined in his May 31, 2001 report that Plaintiff's "[f]uture medical needs in regard to the cervical spine will include an ongoing home exercise program, over-the-counter non-narcotic medications, [and] over-the-counter and/or prescription anti-inflammatories on an intermittent basis." (Harris Admin. R. 221–22).

 Finally, relying on *Levinson v. Reliance Standard Life Insurance Co.*, 245 F.3d 1321 (11th Cir.2001), Plaintiff asserts that because Harris had previously determined that she was entitled to disability benefits and had begun making payments, Harris now has the burden of establishing that Plaintiff is no longer disabled. However, Plaintiff's reliance on *Levinson* is misplaced, as that case does not hold that the burden of proof on the issue of disability shifts to the plan administrator once payments have begun. *Levinson* held that once the claimant had met his obligation under the plan of demonstrating total disability, the plan administrator could not terminate the payment of disability benefits in the absence of evidence that the claimant was no longer disabled. *Id.* at 1331. The significance of *Levinson* was discussed in *Grant v. Provident Life & Accident Insurance Co.*:

> *Levinson* does not support the proposition that [a plan administrator] should

bear the initial burden of proving that [a claimant] is no longer entitled to benefits under the Policies. Rather ... the plan participant seeking to challenge [the plan administrator's] denial of benefits[ ] must demonstrate that he was entitled to receive the residual disability benefits under the terms of the Policies.

No. 99–1329–CIV, 2001 WL 1671028, at *6 (S.D.Fla. June 27, 2001). In other words, there is no shifting of the claimant's burden of proof to establish a disability once a plan administrator honors a claim. As a result of the payment of benefits, the plan does not incur the burden of showing a change in claimant's condition in order to justify a termination of benefits; the claimant retains the burden of proving continued disability. *See Calvert v. Firstar Fin., Inc.*, 266 F.Supp.2d 578, 586 (W.D.Ky.2003) (rejecting claimant's argument that there was no change in her medical condition warranting the termination of her benefits because "[u]nder the Plan, [claimant] had the burden to prove her continued disability and [the plan administrator] had the right under the Plan to reexamine the issue of disability at any time"). Because Harris did not have the burden of establishing Plaintiff was no longer disabled,[4] Plaintiff's argument that Harris failed to meet such a burden is moot.

## IV. Conclusion

Based on the record before this court, it appears that Harris's decision to terminate

---

4. Plaintiff also argues that under Florida insurance law, a plan administrator that has begun benefit payments has the burden of proving a change in the claimant's condition justifying the termination of benefits. However, because the Harris LTD Plan is a plan funded solely through employee contributions, state insurance law does not apply. *FMC Corp. v. Holliday*, 498 U.S. 52, 61, 111 S.Ct. 403, 112 L.Ed.2d 356 (1990) ("State laws that directly regulate insurance are

'saved' [from ERISA preemption] but do not reach self-funded employee benefit plans because the plans may not be deemed to be insurance companies, other insurers, or engaged in the business of insurance for purposes of such state laws."); *Blue Cross & Blue Shield of Ala. v. Sanders*, 138 F.3d 1347, 1356 (11th Cir.1998) (quoting same language as justification for exempting self-funded plan from state statute).

Plaintiff's LTD benefits was correct. However, even if Harris's decision was wrong, in light of the ample record evidence supporting Harris's decision, it cannot be said that the decision was unreasonable or arbitrary and capricious.

For the foregoing reasons, Plaintiff's Motion for Summary Judgment (Doc. 21) is **DENIED** and Defendant's Motion for Summary Judgment (Doc. 23) is **GRANTED**. The Clerk is directed to enter judgment for the Defendant and thereafter to close the file.