Bobbi WALKER–HALL, Plaintiff,

v.

AMERICAN INTERNATIONAL LIFE, ASSURANCE CO. OF NEW YORK, Defendant.

Case No. 8:09–cv–2242–T26MAP.

United States District Court,
M.D. Florida,
Tampa Division.

April 26, 2011.

---

32. *Id.* at 23.

33. Doc. no. 4, Ex. 2, at 2.

Steven E. Hovsepian, Barbas, Nunez, Sanders, Butler & Hovsepian, Tampa, FL, for Plaintiff.

Gideon Reitblat, Mark S. Shapiro, Akerman Senterfitt, Miami, FL, for Defendant.

## ORDER

RICHARD A. LAZZARA, District Judge.

**THIS CAUSE** comes before the Court on Defendant's Motion for Final Judgment, (Dkt. 26), which is accompanied by the administrative record ("AR") (Dkt. 23), and Plaintiff's Response in Opposition (Dkt. 31). The parties have also submitted their Joint Statement of Undisputed Facts (Dkt. 24), Defendant's Statement of Undisputed Facts (Dkt. 25), and Plaintiff's Statement of Disputed Facts (Dkt. 32).

### Plaintiffs Claims

Plaintiff Bobbi Walker–Hall sues Defendant American International Life Assurance Company of New York for recovery of long term disability ("LTD") benefits allegedly due under an ERISA covered benefit plan ("the Plan"), pursuant to 29 U.S.C. § 1132. Plaintiff was employed as an Senior Litigation Specialist for AIG and was a participant in the Plan at all times material to this action. On October 26, 2004, she injured her knee while at work. She received short term disability benefits as a result of her injuries from November 5, 2004, through May 15, 2005, and then received LTD benefits. On October 12, 2006, Defendant denied Plaintiff continuing LTD benefits. In this action, she claims entitlement to continuing benefits based on two medical conditions—a meniscal tear of her right knee and hallux rigidus of her right great toe. Plaintiff appeals the decision to discontinue her long-term disability benefits on grounds that Defendant's third party claims administrator, Disability Re-

insurance Management Services ("DRMS"), was "wrong" when it determined that she failed to meet the Plan language for being under the "regular care of a physician." Plaintiff contends that DRMS initially denied her claim based on the inaccurate assertion that she was capable of performing the duties of her own occupation as a litigation specialist, (Dkt. 23, AR 344, 416–18), then to raise the issue of a "gap in treatment" despite a medical review opinion from Dr. Keller finding Plaintiff had met the "regular care" of a physician provision, (AR 240–41, 279, 293–94), and later turned to the delay in undergoing surgery to deny benefits (AR 80–83). Plaintiff maintains that DRMS ultimately injected additional eligibility requirements for her which were not required by the Plan and that in doing so, DRMS made a decision that was wrong and subsequently maintained the denial without any semblance of a full and fair review of Plaintiff's claim.

Defendant argues that the administrative record establishes that the decision to deny Plaintiff continuing benefits was correct for two reasons. First, with respect to the knee injury, the record reflects that Plaintiff failed to comply with the "Regular Care of a Physician" requirement of the applicable Plan. Second, with respect to Plaintiffs toe injury, she has failed to submit sufficient medical evidence that this condition was disabling and preventing her from working.

### Standard of Review

■ The court's final adjudication of Plaintiffs LTD claim should be pursuant to a Motion for Final Judgment under Rule 52, Federal Rules of Civil Procedure, based on review of the administrative record, rather than a Rule 56 Motion for Summary Judgment. *Smorto v. 3DI Techs., Inc.*, 393 F.Supp.2d 1304, 1313 (M.D.Fla.2005). The district court reviews ERISA benefit determinations more as an appellate tribunal reviewing an administrative decision than a trial court, and the usual rules of summary judgment do not apply. *Curran v. Abbott Laboratories Extended Disability Plan*, No. 04–14097, 2005 WL 894840, at *8 (11th Cir. Mar. 16, 2005); *Crume v. Metropolitan Life Ins. Co.*, 417 F.Supp.2d 1258, 1272 (M.D.Fla. 2006); *Smorto*, 393 F.Supp.2d at 1313.

The Eleventh Circuit established a "well-defined series of steps" for district courts to follow in "reviewing a denial of benefits decision in an ERISA case." *Glazer v. Reliance Standard Life Ins. Co.*, 524 F.3d 1241, 1246 (11th Cir.2008). The steps were outlined by the court as follows:

(1) Apply the *de novo* standard to determine whether the claim administrator's benefits-denial decision is "wrong" (i.e., the court disagrees with the administrator's decision); if it is not, then end the inquiry and affirm the decision;

(2) If the administrator's decision in fact is *"de novo* wrong," then determine whether he was vested with discretion in reviewing claims; if not, end judicial inquiry and reverse the decision;

(3) If the administrator's decision is *"de novo* wrong" and he was vested with discretion in reviewing claims, then determine whether "reasonable" grounds supported it (hence, review his decision under the more deferential arbitrary and capricious standard);

(4) If no reasonable grounds exist, then end the inquiry and reverse the administrator's decision; if reasonable grounds do exist, then determine if he operated under a conflict of interest; and

(5) If there is no conflict, then end the inquiry and affirm the decision.

(6) If there is a conflict of interest, then apply heightened arbitrary and capri-

cious review to the decision to affirm or deny it.[1]

*Capone v. Aetna Life Ins. Co.*, 592 F.3d 1189 (11th Cir.2010) (citing *Williams v. BellSouth Telecomms., Inc.*, 373 F.3d 1132, 1138 (11th Cir.2004), *overruled on other grounds by Doyle v. Liberty Life Assurance Co. of Boston*, 542 F.3d 1352, 1358–57 (11th Cir.2008)).

■ The burden of proving entitlement to ERISA plan benefits is on the claimant. *See e.g., Brannon v. Bellsouth Telecomms., Inc.*, 318 Fed.Appx. 767, 769 (11th Cir. 2009); *Glazer v. Reliance Standard Life Ins. Co.*, 524 F.3d 1241, 1248 (11th Cir. 2008) (holding that "[u]nder ERISA, the plaintiff has the burden of showing that [s]he is entitled to the benefits under the terms of [the] plan"); *Horton v. Reliance Standard Life Ins. Co.*, 141 F.3d 1038, 1040 (11th Cir.1998); *Hufford v. Harris Corp.*, 322 F.Supp.2d 1345, 1360 (M.D.Fla. 2004). This is true regardless of whether the claim denial was from the onset of the claimed disability or whether the claim denial was a termination of benefits that had been paid before the denial. *Hufford,* 322 F.Supp.2d at 1360. In this case, Plaintiff has not met the burden of showing that she is entitled to receive continuing benefits under the Plan. Because the Court agrees with the claim administrator's ben-

efits-denial decision, it need not proceed past the first step outlined in *Capone.*

## Discussion

The Plan at issue requires that in order to receive long-term disability benefits, the claimant must comply with the terms and conditions set out in the Plan. The Plan provides that a monthly disability benefit will be paid only if the claimant is under the Regular Care of a Physician, and that benefits will terminate when the claimant ceases to be under the Regular Care of a Physician.

**When do benefits become payable?**

You will be paid a monthly benefit if: . . . .

(4) you are, and have been during the Elimination Period, under the Regular Care of a Physician . . . .

**When will benefit payments terminate?**

We will terminate benefit payment on the first to occur of: . . . .

3) the date you are no longer under the Regular Care of a Physician, or refuse our request that you submit to an examination by a Physician . . . .

6) the date you refuse to receive recommended treatment that is generally acknowledged by physicians to cure, correct or limit the disabling condition.

---

1. However, as to the sixth step in the analysis, in light of the Supreme Court's decision in *Metropolitan Life Insurance Co. v. Glenn*, 554 U.S. 105, 128 S.Ct. 2343, 171 L.Ed.2d 299 (2008), the Eleventh Circuit recently eliminated the "heightened" standard of review when a conflict of interest is present. *See Doyle,* 542 F.3d at 1360. Instead, "the existence of a conflict of interest should merely be a factor for the district court to take into account when determining whether an administrator's decision was arbitrary and capricious." *Capone,* 592 F.3d at 1196. The Eleventh Circuit further held that, while the reviewing court must take into account an administrative con-

flict when determining whether an administrator's decision was arbitrary and capricious, "the burden remains on the plaintiff to show the decision was arbitrary; it is not the defendant's burden to prove its decision was not tainted by self-interest." *Id.* (quoting *Doyle,* 542 F.3d at 1360). Even where there is a conflict of interest, which Plaintiff bears the burden of showing, courts still "owe deference" to the administrator's "discretionary decisionmaking." *Doyle,* 542 F.3d at 1363. Thus, the *Williams* methodology remains intact except for the sixth step, as modified by *Glenn. See Capone,* 592 F.3d at 1196.

(AR 27.) The Plan defines "Regular Care of a Physician" as follows:

**Regular Care of a Physician** means you are attended by a Physician, who is not you or related to you:

(1) with medical training and clinical experience suitable to treat your disabling condition; and

(2) whose treatment is:

(a) consistent with the diagnosis of the disabling condition, and

(b) according to guidelines established by medical, research, and rehabilitative organizations; and

(c) administered as often as needed, to achieve maximum medical improvement.

(AR 18.)

The Eleventh Circuit Court of Appeals has enforced such a "Regular Care of a Physician" clause. *See Muzyka v. UNUM,* 195 Fed.Appx. 904 (11th Cir.2006) (upholding a denial of benefits based on the claimant's failure to comply with the regular care requirement, where the record showed that the claimant, who alleged that she was suffering from fibromyalgia and chronic pain, visited the doctor only seven times in an 18 month period). And, in *Mack v. UNUM,* 471 F.Supp.2d 1285 (S.D.Fla.2007), a case similar to this one, the district court upheld a denial of benefits based on a plaintiffs failure to comply with the policy requirement that a claimant be under appropriate medical care. The record showed that Mack, who was suffering from diabetes, did not seek treatment for this condition during three separate periods, each ranging from four months to six months. Mack argued that during these periods, he was self-administering prescribed diabetes medications, monitoring his sugar, exercising and watching his diet. However, the record contained a statement from Mack's physician, indicating that the appropriate treatment for Mack's condition included frequent visits to the doctor to monitor his condition. The court looked at the physician's statement as the logical point of reference as to what the appropriate level of medical care was. As a result, due to Mack's failure to comply with the level of medical care set out by his doctor, the court ruled that Mack's self-treatment was insufficient to satisfy the regular care requirement,

■ In this case, it is undisputed that Plaintiff had a disabling condition—a meniscal tear in her right knee. Dr. David Leffers, an orthopedist working at the Florida Orthopedic Institute, treated Plaintiff and diagnosed her condition subsequent to an MRI test on April 28, 2005. (AR 511–512.) Also on that date, he indicated that the reasonable treatment for Plaintiffs condition would be arthroscopic surgery. (AR 479.) Plaintiff agreed to undergo this procedure and actually scheduled it for June 22, 2005. (*Id.*) Plaintiff's second orthopedist, Dr. Robert Henderson, fully agreed that arthroscopy was the proper treatment. (AR 169–7.) Two other board certified orthopedists, Drs. Robert Keller and Louis Nunez, who independently rendered opinions for DRMS, indicated their full agreement that arthroscopy was the proper procedure to cure or correct Plaintiffs knee injury. (AR 288–95, 67–73.) As Defendant points out, Plaintiff has not submitted any evidence or medical opinion to challenge the conclusion that arthroscopy was the proper and generally accepted treatment for the knee injury.

Although Plaintiff initially agreed to have the arthroscopic surgery, she delayed having the procedure for approximately two years, until April 17,2007. (AR 163–64.) Plaintiff did not even return to see Dr. Leffers until May 4, 2006, over a year

after he recommended the procedure. (AR 477–78; *see also* Dkt. 26, Ex. A.) According to Dr. Keller, Plaintiff's failure to see Dr. Leffers for over a year since her last visit, and her delay of the arthroscopy for approximately two years was not appropriate and could result in complicating conditions and ultimately contribute to a less than satisfactory outcome. (AR 288–95.) Dr. Keller indicated that the proper medical care would have been to follow Dr. Leffers' recommendation. (*Id.*) Dr. Nunez concurred with Dr. Keller and opined that the year-long gap (April 28, 2005 through May 4, 2006) between Plaintiffs visits to Dr. Leffers, when she claimed to have been suffering from a disabling condition, was not medically appropriate. (AR 67–73.)

Although Plaintiffs counsel furnished excuses for the two-year delay in treatment, DRMS was entitled to rely on the undisputed opinions of its qualified medical consultants, to deny continuing disability benefits to Plaintiff on the grounds that she was not under the "Regular Care of a Physician." *See Keith v. Prudential Ins. Co., of America,* 347 Fed.Appx. 548 (11th Cir.2009) (upholding administrator's denial of benefits where administrator based its decision on the opinions of three medical professionals who reviewed the claim); *Richey v. Hartford Life & Acc. Ins. Co.,* 608 F.Supp.2d 1306, 1312 (M.D.Fla.2009) (holding that an ERISA administrator is "entitled to rely on the opinion of a qualified medical consultant who neither treats nor examines the claimant, but instead reviews the claimant's medical records)." As previously stated, the Plan provides that benefits terminate when a claimant is no longer under the "Regular Care of a Physician" or when a claimant refuses to receive recommended treatment. The administrative record shows that even though Dr. Leffers recommended an arthroscopy to be performed shortly after

seeing Plaintiff in April of 2005, Plaintiff did not undergo this procedure until April of 2007. And despite being diagnosed in April, 2005 with a condition that Plaintiff claimed was severe enough to prevent her from working, she did not even go back to see Dr. Leffers for her allegedly disabling condition for over a year, or until May, 2006. Based on this record and the opinions of two board certified orthopedists, DRMS determined that Plaintiff's delays in treatment did not constitute regular care. As a result, DRMS's decision to terminate benefits from the date Plaintiff was scheduled to undergo arthroscopy (June 22, 2005), as recommended by her treating doctor, but failed to do so for almost two years, was correct.

Plaintiff failed to submit any medical evidence to challenge the opinions of Dr. Keller and Dr. Nunez, but rather, attempted to justify her failure to receive the recommended treatment, and to even see her orthopedist for over a year. However, as Defendant asserts, the administrative record reflects that Plaintiff's excuses merely obfuscate the actual reason why she did not seek treatment for over a year for her knee injury. The actual reason is that the day before her scheduled arthroscopy, Plaintiffs workers' compensation insurance carrier offered Plaintiff a $50,000 lump sum settlement. In three documented conversations with DRMS, Plaintiff indicated that she delayed her surgery because of the settlement offer. (AR 127–28, 201, 592–93) The Court agrees with Defendant that whatever Plaintiff's personal motivation was for choosing a settlement over performing the procedure that the doctors said would cure her condition, the availability of a potential settlement from another source is simply not a valid reason to disregard the "Regular Care of a Physician" requirement.

Plaintiff claims that she satisfied the Regular Care Requirement because during the year long gap (April 2005–May 2006) when she did not go back to see her orthopedist, Dr. Leffers, she saw Dr. Steven Blustein on February 10, February 28, and May 30, 2006, She also claims that she saw Dr. Arthur Pettygrove on November 22, 2005 and March 13, 2006. (*See* Dkt. 26, Ex. A; AR 245, 538, 542–45.) The record reveals that when Plaintiff finally went back to see Dr. Leffers in May of 2006, she told him that the reason she finally came was because her knee injury "was *recently* aggravated" when she popped her knee, and that she had been unable to fully straighten out her knee since that "*recent* episode." (AR 477–78) (emphasis supplied). The Court agrees with Defendant that Plaintiff's own description of her condition to Dr. Leffers suggests that until the aggravation sometime in the Spring 2006, Plaintiff's knee was not bothering her enough to make her seek treatment earlier and suggests that throughout the relevant period for which Plaintiff is seeking disability benefits, her knee condition did not particularly bother her. (AR 240,) More important, however, these doctors' visits do not satisfy the "Regular Care of a Physician" requirement because even if these visits are assumed to constitute regular care, Plaintiff still has failed to explain why, in light of her allegedly disabling knee injury, she did not see Dr. Pettygrove until November 22, 2005. In other words, even accounting for her visits to non-orthopedic doctors, there still is a seven-month gap in treatment (April 28, 2005 November 22, 2005), during which Plaintiff claims she was disabled and prevented from working, but did not go to see any doctor. Far shorter gaps in treatment than Plaintiffs have been held to preclude recovery of benefits. *See Muzyka,* 195 Fed.Appx. 904 (holding that the regular care requirement not met where claimant

saw a doctor seven times in an eighteen month period); *Mack,* 471 F.Supp.2d 1285 (holding that the regular care requirement not met where claimant skipped doctor visits for periods ranging from four to six months);

Furthermore, the "Regular Care of a Physician" clause requires a claimant to obtain treatment from a doctor "with medical training and clinical experience suitable to treat your disabling condition." Dr. Nunez, a board certified orthopedist opined that while Dr. Blustein, a podiatrist, and Dr. Pettygrove, a family practitioner, were qualified doctors in their fields, they did not have the specific training and experience to treat an orthopedic condition—a meniscal tear of the knee. (AR 47–73.) Plaintiff failed to even submit any evidence that these doctors actually treated her knee injury, other than briefly referencing it in the context of Plaintiffs other conditions. For this reason, Dr. Nunez opined that despite treating with these two physicians, Plaintiff was not under regular care for the condition that she claimed was disabling. (*Id.*)

Plaintiff also sought to blame her workers' compensation insurance carrier for the delay in obtaining treatment. Plaintiff claimed that the insurance carrier, which was administering or authorizing her medical care, transferred her file on numerous occasions, resulting in delays in obtaining authorized medical care. (AR 140.) However, the record shows that her file was transferred on October 24, 2004, June 27, 2005, July 20, 2006, and August 18, 2006, and all but one of these transfers occurred either prior or subsequent to Plaintiff's failure to see Dr. Leffers for an entire year. (*See* Dkt. 26, Ex. A.) The Court concurs with Defendant that while it is plausible that a June 27, 2005, file transfer may have contributed to a minor delay in treatment, it is implausible that Plaintiff's

failure to seek orthopedic treatment between April 2005 and May 2006 was caused by file transfers in the Fall of 2004 and in the Summer of 2006.

In addition, Plaintiff claimed that the delay in treatment was caused by scheduling difficulties with the Florida Orthopedic Institute, where she was supposed to undergo the arthroscopy with Dr. Leffers. She submitted her hand-written notes documenting "network difficulties" at the Institute; however, the notes reflect that Plaintiff was having trouble reaching the Institute on four days—June 3, June 6, June 7, and June 8 of 2005—after which she was able to speak with them. (AR 138–79.) As Defendant points out, Plaintiff fails to explain how the difficulty of reaching her medical provider for four days prevented her from getting treatment for her knee—which she claims has been preventing her from working in the meantime—for an entire year. Plaintiff further directed blame for her delay on the fact that Dr. Leffers was out of town during the periods of June 10, 2006 through July 10, 2006, and July 29, 2006 through August 18, 2006, and then left the employ of the Florida Orthopedic Institute. However, the Court must agree with Defendant that Dr. Leffers's unavailability in the Summer of 2006 has no bearing on why Plaintiff failed to see him during a year-long period prior to this period of unavailability.

Plaintiff claims that she is entitled to disability benefits based on her toe condition in addition to her knee injury, but she again fails to meet her burden. She submitted medical records indicating that she was diagnosed with hallux rigidus/limitus of her right great toe. However, Dr. Keller opined that while Plaintiffs toe condition could produce pain, many patients with that condition continue to function relatively well for prolonged periods of time. Because Plaintiff chose not to undergo the recommended treatment for her toe, Dr. Keller concluded that Plaintiff could function relatively normally without restrictions for work activity, unless her condition worsened to the point that further medical intervention was needed. (AR 288–95.) Similarly, Dr. Nunez concluded that Plaintiffs hallux rigidus did not rise to the level of any impairment. (AR 67–73.) Plaintiff failed to submit any medical opinion to contradict the conclusions of Dr. Keller and Dr. Nunez. Even the medical records from Plaintiff's own podiatrist, Dr. Blustein, merely indicate that she had subjective complaints of pain from her toe and that Dr. Blustein agreed that the toe was probably hurting her. (AR 542.) The records reflect that Plaintiff's toe condition was manageable and had improved after she received an anti-inflammatory injection. (AR 544.) Plaintiffs two podiatrists, Dr. Blustein and Dr. Arthur Walling, suggested surgical treatments to her if the toe was significantly bothering her. Plaintiff did not elect to have such treatment, which further belies her claim that the toe was a disabling condition. (AR 539–42.) In sum, the administrator's decision to deny continuing long-term disability benefits to Plaintiff was not *de novo* wrong and Defendant is entitled to the entry of a final judgment in its favor. *See Cook v. Standard Ins. Co.*, No. 6:08–cv–759–Orl–35DAB, 2010 WL 807443 (M.D.Fla. Mar. 4, 2010) (holding that "an ERISA administrator is entitled to rely on the opinion of a qualified consultant who neither treats nor examines the claimant, but instead views the claimant's medical record").

**ACCORDINGLY, it is ORDERED AND ADJUDGED:**

Defendant's Motion for Final Judgment (Dkt. 26) is granted. The Clerk is directed to enter judgment in favor of Defendant,

terminate any pending motions, and close this case.